**REISER LAW, P.C.**
Michael J. Reiser, Esq. (Bar No. 133621)
michael@reiserlaw.com
Matthew Reiser, Esq. (Bar No. 315301)
matthew@reiserlaw.com
Isabella Martinez, Esq. (Bar No. 315299)
isabella@reiserlaw.com
1990 N. California Blvd, 8th Floor
Walnut Creek, CA 94596
Telephone: (925) 256-0400
Facsimile: (925) 476-0304

**LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP**
Jeffrey C. Schneider, Esq.
Florida Bar No. 933244
(*pro hac vice forthcoming*)
jcs@lklsg.com
Victoria J. Wilson, Esq.
Florida Bar No. 92157
(*pro hac vice forthcoming*)
vjw@lklsg.com
Marcelo Diaz-Cortes, Esq.
Florida Bar No. 118166
(*pro hac vice forthcoming*)
md@lklsg.com
100 SE 2nd Street
Miami Tower, 36th Floor
Miami, Florida 33131
Telephone: (305) 403-8788
Facsimile:  (305) 403-8789
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID STAPLETON, as court-appointed receiver for SILICON SAGE BUILDERS LLC, <br><br> Plaintiff, <br><br> v. <br><br> JPMORGAN CHASE BANK, N.A., <br><br> Defendant. | Case No.: <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

1

Plaintiff David Stapleton (the "Receiver"), as court-appointed receiver for the Receivership Entities,[1] alleges as follows against Defendant JPMorgan Chase Bank, N.A. ("Chase Bank"):

## INTRODUCTION

1.      This is an action against Chase Bank for enabling a massive fraudulent scheme orchestrated by Sanjeev Acharya through the Receivership Entities, which left the Receivership Entities insolvent.  The scheme continued until the Securities and Exchange Commission ("SEC") filed an action against Acharya and his entities and obtained a temporary restraining order.  The Court appointed David Stapleton as Receiver for the Receivership Entities.  *See SEC v. Acharya, et al.*, No. 3:20-cv-09247 (N.D. Cal.) (the "SEC Action").

2.      Since August 2016, Acharya raised over $119 million from over 250 investors for a real estate development business, which he operated through the Receivership Entities using dozens of accounts at Chase Bank.  Acharya financed the real estate projects by offering investors equity interests in specific projects, selling promissory notes, and selling membership interests in other Receivership Entities that loaned money to Receivership Entities that owned the projects.

---

[1] The "Receivership Entities" are: SiliconSage Builders, LLC, SiliconSage Construction, Inc., SiliconSage Homes, Inc., SiliconSage, Inc., Silicon Valley Investment Partnership, LLC, SiliconSage Investments, LLC, SiliconSage Investments 2, LLC, SiliconSage Investments 3, LLC, SiliconSage Investments 4, LLC, SiliconSage Fund 1, LLC, Series 1, 2 and 3, Alum Rock Holdings, LLC, SiliconSage Bridge Fund, LLC, Bay Area Investment Properties, LLC, Santa Clara Real Estate Loan, LLC, 411 Fairoaks Drive, LLC, 115 Evandale, LLC, 538 Mathilda Avenue LLC, 1460 Monroe LLC, SiliconSage Foundation, Inc, Bay Area Investment Properties 2, LLC, Santa Clara Real Estate Loan 2, LLC ,1313 Franklin LLC, 555 Saratoga LLC, 1821 Alamaden LLC, 180 Balbach LLC, 2585 El Camino Real LLC, Bay Area Investment Properties 3, LLC, Bay Area Investment Properties 4, LLC, Santa Clara Real Estate Loan 3, LLC, Crown Court Fremont LLC, SiliconSage Bridge Fund, LLC, Osgood LLC, SiliconSage Fund1 LLC (Series), SiliconSage Fund1 LLC (Series) - Series 1, SiliconSage Fund1 LLC (Series) - Series 2, SiliconSage Fund1 LLC (Series) - Series 3, SiliconSage Fund1 LLC (Series) - Series 4, SiliconSage Fund1 LLC (Series) - Series 5, Peralta At Fremont LLC, SiliconSage Projects, LLC, SiliconSage Design, LLC, Siliconsage Mortgage, Inc , Little Portugal Gateway LLC, Little Portugal OZ Fund LP, Little Portugal OZ GP LLC, B Street Hayward, LLC, Walnut Morgan Hill, LLC, Walnut Morgan Hill Holdings, LLC, B Street Hayward Holdings, LLC, Alum Rock Lender LLC, The Grove Newark LLC, YoungGenius Management, Inc., Sage at Irvington LLC, Downtown Gateway Retail LLC, 528 Mathilda LLC, Centerville Station LLC, SiliconSage Debt Fund LLC, Alum Rock Property LLC and, 138 BALBACH LLC.

3.     To raise money from investors, Acharya touted that all his real estate projects had been profitable for investors and that returns paid to investors were derived from the Receivership Entities' profits.  In reality, since at least August 2016, all but one of the Receivership Entities' nine projects failed to return a profit, including five that were simply abandoned.  The projects had significant cost overruns and did not generate enough revenue to cover the overruns, leaving the Receivership Entities with mounting, undisclosed liabilities to investors and others.

4.     Acharya relied on Ponzi-like payments to generate investor returns and brought in new investors by falsely representing the profitability of the projects and promising illusory redemption rights, driving the Receivership Entities deeper and deeper into insolvency.  While mounting up insurmountable debt through fraud, Acharya used accounts at Chase Bank to misappropriate funds from the Receivership Entities by making improper inter-entity transfers, making transfers to himself, and paying false returns to investors.

5.     Acharya was the president, CEO, and manager of the Receivership Entities and had complete dominion and control over the Receivership Entities and their finances.  Accounts at Chase Bank served as the exclusive vehicle to misappropriate the Receivership Entities' funds and recharacterize investment funds into purported profits.  Indeed, Chase Bank hosted all the accounts and executed the deceptive transactions that allowed Acharya to run the fraudulent scheme and dissipate the Receivership Entities' funds.  The Receivership Entities held a combined 77 bank accounts at Chase Bank and conducted more than 130,000 banking transactions through Chase Bank.  Acharya also held a personal bank account at Chase Bank, which received large transfers from the Receivership Entities.

6.     Chase Bank knew of and substantially assisted Acharya's scheme.  From a bank's perspective, the fraudulent scheme was obvious.  A fraudulent scheme of this magnitude cannot be run surreptitiously through one bank.  And here, it did not.

7.     Indeed, Chase Bank employees, acting within the scope of their duties at Chase Bank, were intimately and actively involved with the activity in the Receivership Entities' accounts and had constant contact with Acharya and his agents.  In particular, the Business Relationship Manager for the accounts developed a long-standing, close relationship with Acharya

and his team and was the primary point of contact for the accounts. Beyond that, he developed a personal relationship with Acharya that went well beyond a typical arms-length banking relationship.

8.     The Chase Bank Business Relationship Manager knew the ins and outs of the business and the activities going on in all of the Receivership Entities' accounts. He assisted with the opening and closing of accounts, actively monitored the accounts, and was in constant communication with Acharya and his agents about the accounts and the businesses. He knew that there was a constant influx of tens of millions of dollars from investors into the Receivership Entities' accounts, and there are numerous emails discussing investors and identifying transfers to or from investors for investment in a particular Receivership Entity.

9.     Chase Bank employees knew that funds deposited in the Receivership Entitles' accounts were rapidly swept and transferred around multiple entities' accounts and commingled with accounts for other projects. Chase Bank employees went above and beyond to accommodate the rapid and unusual transactions by consistently bypassing Chase Bank's internal deposit processing system, clearing deposits before the holding period, and circumventing other fraud procedures.

10.     Chase Bank employees and the Business Relationship Manager knew that—despite the constant influx of investor funds—the Receivership Entities were constantly overdrawn, resulting in hundreds of insufficient funds notices. They also knew that wire transfers were being initiated from Receivership Entities' accounts with insufficient funds to cover the wires. They knew Receivership Entities' funds were misdirected to other entities' accounts to cover cash flow needs. Chase Bank employees actively enabled such misuse of the accounts. For example, the Business Relationship Manager would actively monitor the accounts and notify Acharya if an account needed a transfer from another Receivership Entity to cover an outgoing wire.

11.     The Business Relationship Manager even "confidential[ly]" tipped Acharya off that Chase Bank was initiating a Know Your Customer review on one of the Receivership Entities.

12.     In addition to its employees' active involvement, Chase Bank's knowledge of the scheme is further bolstered by its "Know Your Customer" inquiries into the accounts and its

4

AML/fraud monitoring duties.  From the time of opening the Receivership Entities' accounts, Chase Bank knew that Acharya was supposed to use funds invested in the respective Receivership Entities to complete and sell the corresponding real estate projects to generate money to repay investors.  Chase Bank also knew that Acharya had dominion and control over the Receivership Entities and owed them fiduciary duties.

13.    Chase Bank, as the nation's largest bank with sophisticated software and processes to detect unlawful transactions, observed firsthand Acharya's misuse of the Receivership Entities' funds.  Chase Bank looked for such fraudulent activity because, as a regulated financial institution, it had to.

14.    Chase Bank saw that very little money going into the accounts came from profits of real estate projects.  Instead, Chase Bank saw a great deal of investor money and loans entering the Receivership Entities' accounts and an array of banking activities blatantly at odds with the claimed business model.  Chase Bank saw rapid movement of investment funds through multiple entities' accounts often on the same day, sometimes within minutes.  It saw the immediate diversion of Receivership Entities' funds to cover the debts and needs of other Receivership Entities.  The accounts were constantly overdrawn, and transfers from Receivership Entities were made to cover outgoing transfers from other Receivership Entities.  The account activity was rife with wire fraud and money laundering, generating hundreds of insufficient funds notices and triggering other alerts.  Additionally, despite the lack of profits, Chase Bank saw new investor funds being used to pay false returns to other investors.

15.    Thus, for anyone who saw how Acharya was moving the Receivership Entities' funds, the pattern of misuse of the Receivership Entities' funds was self-evident.  Despite this knowledge, Chase Bank substantially assisted Acharya by allowing and actively enabling him to continue operating with Chase Bank accounts, commingle investor funds, divert the Receivership Entities' funds, and make the transfers necessary to perpetrate the scheme.

16.    With its goal to maximize assets held, account and transfer-related revenue, and compensation, Chase Bank and its employees actively accommodated Acharya's pattern of misuse and misappropriation and went well beyond providing ordinary banking services.

1
2
3

## PARTIES AND RELEVANT NONPARTIES

### I.   Plaintiff

1.      Judge Illston appointed the Receiver for the Receivership Entities in the pending action *SEC v. Acharya, et al.*, No. 3:20-cv-09247 (N.D. Cal.) (the "SEC Action").  Acharya is a principal defendant in the SEC Action.

2.      The Receiver is a natural person over the age of 21 and otherwise *sui juris*.  He is a citizen and resident of California.   The Receiver's authority derives from the Receivership Order entered by Judge Illston in the SEC Action. Among other things, the Receiver is charged with marshaling and preserving the assets of the Receivership Estate and investigating and prosecuting claims for the benefit or on behalf of the Receivership Estate.

### II.   Defendant

3.      Defendant Chase Bank is a nationally chartered bank, with its main office in Columbus, Ohio.

### III.   Nonparties

4.      Acharya is a resident of California and served as president, CEO, and manager of the Receivership Entities.

5.      The Receivership Entities were all formed in either California or Delaware and are now under the exclusive control of the Receiver.

## JURISDICTION AND VENUE

6.      This action is brought to accomplish the objectives of the Receivership Order and is ancillary to the SEC Action pending in this District.  This Court thus has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 754, 1367. In addition, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the Receiver, along with the Receivership Entities, and Chase Bank are citizens of different states and the amount in controversy exceeds $75,000.

7.     This Court has specific personal jurisdiction over Chase Bank because the Receiver's claims arise out of Chase Bank's activity and unlawful conduct in California.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the acts complained of herein occurred in this District, Chase Bank transacts business and may be found in this District, and the SEC Action is pending in this District.

9.     All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

### I.     The Fraudulent Scheme

10.     Since at least August 2016, Acharya raised at least $119 million from over 250 investors through a fraudulent investment scheme advertised as a profitable real estate development business.

11.     Acharya used a web of affiliated entities founded and controlled by him to carry out his fraud.  His real estate development business used various affiliated Receivership Entities for different aspects of development: (1) SiliconSage Builders, LLC led the process of land acquisition, obtaining entitlements, and designating projects; (2) SiliconSage Construction, Inc. acted as the general contractor; (3) SiliconSage Homes, Inc. marketed the properties; and (4) SiliconSage, Inc. provided technical support.

12.     Acharya founded numerous Receivership Entities to provide financing to the projects (the "Equity Investment Entities").

13.     Acharya formed separate Receivership Entities to own and develop each real estate project. (the "Builder LLCs")

14.     Acharya also formed the SiliconSage Bridge Fund, LLC (the "Bridge Fund") purportedly to lend money to other affiliated Receivership Entities in exchange for a 15% fixed monthly return from the projects' aggregated profits.

15.     To obtain financing for the real estate projects, Acharya originally marketed the investments to friends and family.  Through referrals, he then expanded his investor base to hundreds of investors.  Acharya personally solicited investors by meeting prospective investors in

person or by phone, showing them powerpoint presentations, and emailing them marketing and offering materials.

16.     Beginning in at least August 2016, Acharya misrepresented to investors that the real estate projects were profitable and successful, avowing that all his investors have been paid their returns.  Acharya routinely described the returns to his investors as deriving from the profits generated by the properties.

17.     Acharya described the business model as follows: at the time of a property's exit, the proceeds of the sale are first used to pay off the bank and construction loans and then to pay off investors' capital and interest; only after investors are paid do the Receivership Entities receive any profits.  At the end of a project or investment term, Acharya would encourage investors to roll their investments into other offerings.

**A.     Investment Vehicles**

18.     Acharya offered three general forms of investments: equity interests, the Bridge Fund, and promissory notes.

### 1.     *Equity Offerings*

19.     Equity investors contributed money to a specific real estate project, typically through subscription agreements for membership interests for a particular Equity Investment Entity.  That entity was supposed to then loan money to the Builder LLC that owned the project to acquire land and develop it.

20.     Investors were offered high rates of return, ranging from 18% to 23% per annum, to be paid once the project was completed from the proceeds of the sale.

21.     The Receivership Entities raised approximately $97,547,296 from equity investors, with at least $63,442,436 raised since August 24, 2016—the date the first of his many unprofitable projects exited without paying the advertised returns.

### 2.     *The Bridge Fund*

22.     In 2014, Acharya formed the Bridge Fund.  Bridge Fund investors purchased membership interests in the Fund, pursuant to subscription and operating agreements.  The Bridge Fund investors' money was to be loaned to affiliated Receivership Entities on an as-needed basis

to complete construction on the projects.  The Fund promised fixed returns of 15% per annum, payable monthly, and "derived from aggregated profits earned by [the projects]."

23.     After a one-year lockup, investors could give notice and request return of their principal, which would be "processed" after an additional 90 days.

24.     In the offering documents, Silicon Sage Builders guaranteed repayment of the Fund's loans.

25.     The Bridge Fund offering documents also stated that "the total capital contributions raised by [the Bridge Fund] at any given point of time shall not exceed 50% of the reserves and projected profits, over a 2 year window, of [the projects]."

26.     According to the subscription agreement, the Bridge Fund offering was between $7 and $11 million (35-55 units at $200,000 per unit).

27.     Despite these stated limitations, from 2014, the Bridge Fund in fact raised over $50 million, of which at least $31,094,428 was raised from investors since August 24, 2016.

28.     Since 2014, according to Acharya, approximately $26,614,391 was withdrawn in redemptions or rolled over to another investment, and approximately $21,318,453.70 was paid out in monthly interest.

29.     The Bridge Fund owes approximately $40 million to investors.

### *3.     Promissory Notes*

30.     Beginning in October 2017, Acharya began offering unsecured promissory notes as an additional form of investment.  The duration and size of the notes varied from 1-24 months and between $10,000 to over one $1 million.

31.     Generally, the Builder LLC promised to pay the note back, with a range of interest rates (*e.g.* 15% or 25% per annum), and the Builder LLC (as well as, in some cases other entities and/or Acharya) guaranteed repayment.

32.     At least one form of the notes stated that they are "acquired for investment" and are not registered under the Securities Act.

33.     Since 2017, the Receivership Entities raised at least $24,709,891.23 from 97 notes issued to at least 63 investors in California, Nevada, Georgia, and Texas—after the Receivership Entities had exited numerous prior projects without realizing profits.

**B.     Misappropriation, Concealment, and Fraud**

34.     Since August 2016, the Receivership Entities had exited all but one of their real estate projects without realizing any profits.

35.     Acharya nevertheless continued misrepresenting to investors that the Receivership Entities were profitable and had successfully exited 11 past projects.  He falsely asserted that all his investors had been paid their returns, and that those returns were derived from the profits generated by the Receivership Entities' real estate projects.

36.     In reality, Acharya concealed from investors that the Receivership Entities had not generated enough profits to cover construction overruns, were over budget, did not generate returns for investors, and owed significant liabilities to the Bridge Fund due to abandoned and unprofitable projects.

37.     By the fall of 2020, the Bridge Fund was owed approximately $40 million from other Receivership Entities.

38.     Acharya controlled the Receivership Entities' finances.  Acharya opened and had signatory authority on the Receivership Entities' accounts at Chase Bank, including those to which investors sent their funds.

39.     Acharya misappropriated, extensively commingled, and improperly used the Receivership Entities' funds to pay the debts and needs of other Receivership Entities.  Funds invested in a specific Receivership Entity would be transferred through multiple Receivership Entities' accounts, usually the same day or within a matter of minutes, before ending up in the account of a Receivership Entity that needed to make payments that day.  The transfers were without regard to which Receivership Entity owned the funds or the purpose of the investment and instead were used to satisfy whatever Receivership Entities had cash flow needs.

40.     Most funds invested in a particular Receivership Entity ultimately benefited a different Receivership Entity or project than had been intended by the lender or investor that had

contributed the funds.  In many instances, funds invested in a Receivership Entity went through five or more different transfers before being spent or commingled with cash belonging to other projects.

41.     Acharya also made Ponzi-like payments and promised illusory redemption rights.

42.     Acharya concealed that the Bridge Fund was—contrary to its stated purpose to lend money to finance real estate projects—actually used to use investor money to pay other investors' interest.  While raising money for the Bridge Fund with the promise of redemptions after a one-year lockup and a ninety-day processing period, he hid the fact that the Bridge Fund had refused other investors' redemption requests in 2018, 2019, and early 2020.  Acharya raised new money for the Bridge Fund as late as February 2020, without revealing these facts, driving the Receivership Entities deeper and deeper into debt.

43.     The Bridge Fund concealed that it had loaned at least $2,486,000 to projects that had been abandoned, and thus could not generate any return for the Receivership Entities; that it had invested at least $15,798,660 in projects that did not generate sufficient returns to provide any profit to the Receivership Entities, and thus could not be used to generate any return for the Bridge Fund; and that, affiliated Receivership Entities bore the liability for the Bridge Fund interest.

44.     The Bridge Fund had raised over $45 million by summer 2020—more than four times he had represented it would raise.

45.     Rather than reveal the true facts to investors, Acharya consistently engaged in deceptive conduct designed to enable him to continue raising money, and to discourage existing investors from seeking to withdraw their funds or to swap their interests for different investment products.

46.     Acharya needed to pivot when the pandemic hit.  In March 2020, he began warning of a short-term "liquidity" problem purportedly stemming from the COVID-19 pandemic, urging new investments.  He falsely assured existing investors that the Receivership Entities were still paying interest on the Bridge Fund, but had a short term cash need.

47.     That same month, Acharya asked certain Bridge Fund investors to defer their interest payments for up to six months in exchange for a bump in the interest they would

supposedly receive at the end of the period.   Acharya did not disclose the existing cost overruns and unprofitable or abandoned projects, nor his reliance on Bridge Fund monies to pay investor interest, or his inability to honor Bridge Fund redemption requests.

48.   In May 2020, Acharya informed the Bridge Fund investors that he could not make interest payments or honor redemption requests for three months, attributing this solely to cash flow issues from the pandemic.

49.   He continued soliciting new investors using the same misrepresentations regarding profitable projects and unblemished history of payment to all investors their returns out of the Receivership Entities' profits.  Indeed, Acharya raised money in 2020 across all projects, including at least 30 new investors, and over $17 million including new investments, rollover investments and swaps.

50.   At a June 23, 2020 investor meeting, despite his representations that the Bridge Fund interest payments flowed from the Receivership Entities' profits, Acharya first acknowledged that Bridge Fund interest payments were impacted by the lack of new investor money, stating that "the biggest challenge in reopening Bridge Fund is figuring out consistent cash flow for Bridge Fund interest payments in a sustainable manner."   He offered Bridge Fund investors the option of rolling their investment over to other Receivership Entities as a down payment for a future condo.

51.   A few investors volunteered to liaise with Acharya and met with him several times in July 2020. During these meetings, Acharya admitted to this group that all of his past projects except one had not actually been profitable—and that he had not made any money.  He admitted that the Bridge Fund had in fact already raised $45 million – not $7 or 11 million as advertised. He also admitted that the Receivership Entities had no cash and that all the funds raised from investors had been spent.  Though he had already raised $20 million for a new project, he admitted that he had no investor money left, even though the project had not yet purchased all of the real estate.

52.   On July 26, 2020, one of the investor volunteers hosted a call with the broader investor group to announce what he had learned, and was met with "shock."  Acharya tried to

minimize the fallout and keep the news from getting out.  On July 28, 2020, he emailed the investors saying that the volunteer's account was the view of just that investor, not the investor volunteers as a whole.  Though he admitted that "some of the prior projects had cost overruns," he claimed that he had "deliver[ed] many initial projects on time and at or near budget," admitting only that he had "made some execution delay mistakes resulting in cost overruns as I scaled up Silicon Sage to much larger projects...." and claiming that there was "no [] swindling involved."

53.   Acharya then called the volunteer who had hosted the call and offered him cash for his Bridge Fund investment if he left "quietly."  When the investor pushed back, Acharya offered to give the same deal to the investor's friends, saying he had many investors who trusted him and that he could get the money. When the investor declined, he offered him a condo instead. Around the same time, Acharya invited another investor to swap his existing interest for an equivalent interest in another property, claiming that he was "getting new investors" and had "millions of dollars coming in." When the investor said this would be tantamount to a Ponzi scheme, Acharya replied that as the manager of the Receivership Entities, he could do whatever he wanted.

54.   By August 2020, Acharya's characterization of the Receivership Entities' problems as short-term and pandemic-induced had morphed into asserted past "mistakes." In an August 4 investor call, he acknowledged "cost control issues which I am responsible for" and that a "constant criticism of [his] operations was that [he] ha[d] not been forthcoming on project finances and project issues," claiming he was "making changes to this."

55.   On an August 14 investor call, when asked why he had not been more transparent with investors, he said that he agreed that transparency would have helped, saying, "I should have done it. Back then, maybe my thinking was that everybody's returns will come... So ... I really didn't bother to get into details, but what I was not thinking, what my mistake was that I wasn't thinking a downside scenario." In the accompanying presentation, Acharya stated he could have "spent more time doing post mortem on early projects to learn from them and not repeat the same mistakes."

56.   He continued to solicit swaps between the various investments—Bridge Fund investors could convert their investment into an equity investment in other Receivership Entities

or a down payment for a condo in a project.  He also offered all investors the opportunity to exchange their investments for a condo, if they supplemented their existing investment with new cash.  In an August 20 investor presentation, Acharya described an "urgent need" for "immediate working capital," claiming there would be "no dilution or any effect to" the equity investors' returns.

57.    On August 21 and September 9, however, Acharya finally admitted to the Receivership Entities' construction overruns, lack of profitability, the liabilities owed to the Bridge Fund, Equity Investment Entities, and notes, and the use of Bridge Fund money to pay Bridge Fund interest.  He revealed that several projects were over budget, and several projects did not generate profits to pay the Bridge Fund, notes investors, or equity investors.  He claimed to have "learnt this lesson quite late when we were committed to finishing" the projects.  He described the Bridge Fund as a "mistake," because "for a development business that [has] exits that take four to five years out... till the exit happens, there is no income coming."

58.    He admitted to a "lack of controls and visibility till after the damage was done," nevertheless still claiming that "future projects will have a huge benefit."  As for the Bridge Fund, he cited the "lack of leeway in interest terms and redemption of Bridge Fund is not suitable for our type of business," saying he would close it and "work on redemption."

59.    Despite his inculpatory revelations to existing investors, Acharya brought in at least 30 new investors since March 2020, and accepted investments (whether new, rollover or swapped) totaling more than $17 million.  Thus, notwithstanding Acharya's knowing—and admitting—that he had for years been raising money under false pretenses for an unprofitable enterprise reliant on new investor funds to pay existing investors, he continued soliciting investors for the Receivership Entities, driving them deeper into insolvency.

**II.    Chase Bank Knew About and Substantially Assisted Acharya's Breach of Fiduciary Duty, Fraud, and Conversion**

60.    Acharya used accounts at Chase Bank as the exclusive vehicle to misuse the Receivership Entities' funds by misappropriating the funds, paying the debts and needs of other Receivership Entities, using the Receivership Entities' investment funds to pay false returns, and

transferring the Receivership Entities' funds to his personal account, which was also held at Chase Bank. Indeed, Chase Bank hosted the accounts and executed the deceptive transactions that allowed Acharya to run the fraudulent scheme and dissipate the Receivership Entities' funds and drive them further and further into debt.

61. Acharya had dominion over the Receivership Entities and their finances. The Receivership Entities held a combined 77 bank accounts at Chase Bank and conducted more than 130,000 banking transactions through Chase Bank. Acharya also held a personal bank account at Chase Bank, which received large transfers from various Receivership Entities.

62. Acharya was able to use accounts at Chase Bank to take in the Receivership Entities' funds and divert them from their intended purpose.

**A. Chase Bank Employees Had Extensive Involvement in the Account Transactions and Business**

63. Various Chase Bank employees had extensive direct and unfiltered contact with Acharya and his agents to service his needs relating to the Receivership Entities' accounts.

64. Chase Bank's interactions with Acharya and his agents confirm its knowledge of the nature and intended purpose of the Receivership Entities and the misuse of their funds. Indeed, Chase Bank employees became heavily involved in how the businesses operated (or were supposed to operate).

65. Chase Bank observed and participated in banking behavior that completely contradicted the stated operation, including the misappropriation and siphoning of funds by Acharya. And Chase Bank knew that such actions with the Receivership Entities' funds were improper and harming the Receivership Entities.

66. Chase Bank is required by law to conduct inquiries into its customers' business and the propriety of their transactions. In this case, Chase Bank went well beyond that. Its employees became intimately involved with the business and gained actual knowledge of the misuse of funds. Chase Bank nonetheless kept housing the accounts and actively facilitating Acharya's transactions, all to the detriment of the Receivership Entities.

67.     Chase Bank employees observed activity in the accounts that it knew had no possible legitimate relationship to the Receivership Entities' purported businesses. The transactions in the accounts were rapid and voluminous and required constant and active accommodations from Chase Bank employees.

68.     Incoming investor funds went into specific Receivership Entity accounts earmarked for specific uses, projects or entities, but from there they were misdirected to fund other projects, to pay other Receivership Entities' cash flow needs, and to pay false investor returns—all through Chase Bank.  Chase Bank thus witnessed investor funds flowing across multiple different Receivership Entities accounts, sometimes dozens of times in a single day, and back out in the form of returns to repay investors, or to pay the needs of a different Receivership Entity.  The Receivership Entities' transactions, which triggered hundreds of insufficient funds alerts, occurred among related entities, and often could be traced with large, same-figure transfers, likely triggered bank monitoring alerts and prompted inquiries.

69.     To illustrate the volume of the rapid-fire transactions, a review of accounts for only four Receivership Entities on a single day alone revealed total of 317 transactions on January 23, 2019, which was comprised of (i) 152 cash receipts totaling approximately $12 million, and (ii) 165 cash disbursements totaling approximately $12 million.  Of those 317 transactions, 252 occurred between 14 Receivership Entities and were comprised of (i) 150 cash receipts totaling approximately $12 million and (ii) 102 cash disbursements totaling approximately $11 million.

70.     Most investment funds ultimately were used for a different Receivership Entity than had been intended by the lender or investor that had contributed the funds.  Funds invested in a specific Receivership Entity would be transferred through multiple Receivership Entities' accounts before ending up in the account of a Receivership Entity that needed to make payments that day. The transfers were without regard to which Receivership Entity owned the funds or the purpose of the investment and instead were used to satisfy whatever Receivership Entities had cash flow needs.

71.     At times, funds invested in the Receivership Entities were transferred to Acharya's personal account, which was also held at Chase Bank.

72.     The transactions in the accounts resulted in hundreds of insufficient funds notices.

73.     Chase Bank went above and beyond to accommodate Acharya's constant need to immediately move incoming funds before they cleared to meet obligations of other Receivership Entities.   Chase Bank employees consistently cleared deposits early to allow Acharya to immediately wire money out that had just been wired into an account minutes or hours beforehand.

74.     One such Chase Bank employee had a particularly close relationship with Acharya. That employee, whose initials are "J.E.," was the Business Relationship Manager at Chase Bank for the Receivership Entities' accounts throughout the relevant period.  He worked out of Chase Bank's office at 410 South Mathilda Avenue in Sunnyvale, California.

75.     The contact between Acharya and J.E. was extensive.  J.E. developed a long-standing and intimate relationship with Acharya and was the primary point of contact for the Receivership Entities' accounts.  He was heavily involved with the Receivership Entities' business and use of the accounts.

76.     Acting within the scope of his duties as the Business Relationship Manager, J.E. actively assisted Acharya and his agents in facilitating the unhindered movement of the Receivership Entities' funds.

77.     Acharya's relationship with J.E. goes back to at least 2012.  Early on, Chase Bank employees, including J.E., were aware of and accommodated improper transactions in the Receivership Entities' accounts.  For example, in June 2014, Acharya's agent sent J.E. and another Chase Bank employee the following "URGENT" email requesting their assistance in essentially defrauding a bond company by knowingly misrepresenting the funds available to SiliconSage Builders in a statement of account:

As discussed, I had transferred funds in the SiliconSage Builders Account (Ac# 130783900). Now the balance showing is $1,701,859.11. It will reflect as a pending transaction today but should be reflected in the account statement by tomorrow. We need to show the balance in the account as a proof of fund for getting a Bond.
Please prepare a statement of account for # 130783900 and email and fax (Fax No: 408-228-6111) to me (please copy Sanjeev).
We definitely need the account statement first thing in the morning. I need to transfer back the funds to the respective accounts, else the checks will get overdrawn from many accounts.
If you have any questions, please call be immediately.

78.     A Chase Bank employee followed up to confirm that Chase Bank had accommodated that request and Acharya's agent confirmed it had.

79.     J.E. also knew early on that Acharya was engaged in activities like issuing checks for accounts before there were sufficient funds.  For example, on August 26, 2014, Acharya's agent wrote the following email to J.E.: "We have deposited the checks yesterday in Siliconsage Builders and SSI3 account. Please get the funds released as we have already issued checks against that. Accounts [sic]: please call me and let me know as soon as the funds are released. Need to transfer the funds."  After getting the deposits released, J.E. cautioned Acharya's agent and coached him to avoid raising red flags, stating, "Please be Gentle to move the Money out!"

80.     J.E. knew the ins and outs of the business and the activities going on in all of the Receivership Entities' accounts.  He knew it was a development venture operating with investor funds.  Indeed, he assisted with the opening and closing of accounts, and closely monitored activity in the accounts.  J.E. was sent copies of at least some entities' subscription agreements, limited partnership agreements, and operating agreements.  He was also copied on many business-related emails.

81.     J.E. also assisted with opening Acharya's personal account at Chase Bank, which received large transfers from the Receivership Entities.

82.     J.E. and other Chase Bank employees knew that there was a constant influx of investor funds into the accounts, often from repeat investors.  There were numerous emails with J.E. referring to investors and identifying checks or transfers as coming from investors.  Some emails to J.E. identified transfers as coming from repeat investors.  On at least one occasion, J.E. referred potential investors to Acharya's agents and asked if a specific project had funding to "finish the year successfully."

83.     J.E. and other Chase Bank employees assisted Acharya and his agents with circumventing normal banking procedures.  At Acharya and his agents' request, J.E. and other Chase Bank employees showed an unrelenting commitment to pushing deposits through any "holding period," making funds immediately available for transfer out of the accounts.  Many of those deposits were identified in emails with J.E. as coming from investors.  J.E. was persistent in

getting deposits cleared, even when they were flagged by Chase Bank as potential fraud, warranting a 6-day hold.

84.     J.E. and other Chase Bank employees accommodated these requests so often that Acharya would expect and demand deposits to be cleared immediately.  By way of example, in one email exchange, an agent of Acharya's expressed irritation that it took over 12 hours for J.E. to clear a deposit, stating, "In the past you could help us release the funds immediately. What has changed? Can you please find out any better solution?"

85.     J.E. even made light of the pace at which money moved in and out of Receivership Entity accounts when he joked that "[s]urprisingly money hasn't [*sic*] spent yet" in a confirmation email after he cleared a deposit.

86.     J.E. and other Chase Bank employees would also circumvent normal fraud procedures.  For example, J.E. sent Acharya an email on June 20, 2019, asking if a check was fraud and requesting Acharya to verify the amount.  Acharya responded, "No, this isn't fraud. Please allow it to process through our account."  J.E. asked Acharya again to verify the amount. Acharya then responded saying said it is an "[i]mportant check.  Please clear it!"  Even though Acharya still did not verify the amount as requested, J.E. responded, "Paid!"

87.     J.E. and other Chase Bank employees knew that, despite the constant influx of investor funds, the accounts were constantly overdrawn.  Chase Bank employees knew that funds intended for one Receivership Entity would be transferred to cover the cash flow needs of another Receivership Entity with insufficient funds.  Indeed, J.E. would very actively monitor the accounts and warn Acharya and his agents if there were insufficient funds for outgoing wires and instruct Acharya as to which accounts needed transfers from other Receivership Entities.  Transfers would then come in from other Receivership Entities' accounts to cover the wires. Other times Acharya or his agents would request a call with J.E. to discuss.

88.     Acharya would also tell J.E. to let him know which accounts "need cash," and J.E. would oblige.  J.E. also told Acharya to inform him before making a transfer to an overdrawn account because "[w]e dont [sic] want BackOffice to take action."

89.    On January 3, 2018, J.E. sent Acharya a "Confidential" email tipping him off that Chase Bank was conducting a Know Your Customer review on SiliconSage Inc. and included the internal notice he had received:

**Subject:** Silicon Sage

Below is taking care of this week. FYI

Confidential...

We have begun a KYC review on your customer (SILICON SAGE INC ECI: 0526208832). In order to continue with the review and avoid any adverse impact to our customer's accounts please complete these actions for the customer:

   1. Complete all components in the KYC Remediation link ....

   Additional requests for information or clarification questions may be sent to us as we work through the details of the customer and their KYC information.

We will also send a letter to the customer, if needed, advising them that we need to collect additional information.

90.    Acharya responded telling J.E. to "keep us posted on this."

91.    The communication was constant.  When Acharya's asked for a call about a "sensitive matter . . . ASAP," J.E. responded that it was unusual that they had not spoken in over two weeks and that he would call in five minutes.

92.    When the pandemic hit, J.E. tried to help Acharya get additional financing for SiliconSage Builders and Silicon Sage Construction.  To that end, J.E. requested financials for the entities and included a questionnaire asking: "What Business and Financial Plans help you survive recent down turn."  For Silicon Sage Builders, Acharya's agent responded that they were increasing the cash flow, in part, through "[r]aising more equity from investors."

93.    J.E. also assisted with the closing of various Receivership Entity accounts, including the transfer of any balances to other Receivership Entities for other projects.  He did not see profits coming into those entities from completed projects and going to investors.

94.    The relationship between J.E. and Acharya was significantly closer than a typical arms-length banking relationship.  For example, when Acharya's child was born, Acharya invited J.E. and his wife to the child's one-month celebration.  In 2014, J.E. asked Acharya for advice and feedback on his personal home construction project.

95.     Acharya appreciated the personal assistance and time given to efficiently processing his transactions. Acharya showed his appreciation by writing a flowery email of commendation to J.E.'s manager, informing him that J.E. was a key player in his satisfaction Chase Bank.

96.     At times, J.E. would travel to Acharya's office in order to obtain signatures on documents, rather than have Acharya come into a Chase Bank branch.  In fact, on at least one occasion, Acharya demanded that J.E. come to his office, stating, "I am not coming to bank don't have time for that. I need you to come down to our office."

97.     Thus, J.E. and other Chase Bank employees were heavily involved with Acharya and the Receivership Entities, witnessed how the Receivership Entities' funds were being misused, and actively enabled Acharya's atypical banking procedures.  Chase Bank thus became more than just a bank processing Acharya's transactions.  Chase Bank became a knowing and active participant of Acharya's misconduct—all to keep active accounts and generate revenue.

98.     The knowledge and assistance of J.E. and other Chase Bank employees can be imputed to Chase Bank.  The efforts to help Acharya's improper banking activities were performed within the scope the employees' employment duties and occurred during working hours.  They occurred during working hours and as part of the scope of normal job duties.

99.     Moreover, J.E. and other Chase Bank employees' efforts unquestionably benefited the bank as well.  Chase Bank received tens of millions of dollars in deposits that generated significant fees and other income to the bank.

**B.      Account Activity Was Inconsistent with Know Your Customer Information and Triggered Suspicious Activity Systems**

100.     In addition to Chase Bank employees' active involvement in the accounts and extensive direct contact with Acharya and his agents, Chase Bank had knowledge of the Receivership Entities' operations and Acharya's misconduct through its mandated procedures.

101.     Federal law requires banks to "know their customers" and understand their customers' banking behavior.  *See, e.g.*, 31 C.F.R. § 1020.220.  According to Chase Bank, it complies with these obligations.  Chase Bank must collect information about its customers when

it opens an account for them and as they transact.  Where an entity opens an account, the bank must obtain information concerning the individuals who control the account.

102.    Chase Bank also must conduct customer due diligence to gauge the risk of fraud, money laundering, terrorist financing, or other illicit account uses.  *See, e.g.*, 31 CFR § 1020.210. It is required to understand the types of transactions in which its customers are likely to engage and remain vigilant for transactions that may be suspicious. These laws impose on Chase Bank a duty to understand the nature and purpose of their customer relationships and develop a customer risk profile.  This information must then be used for ongoing monitoring of its customers' transactions.

103.    Such duties form part of the federally mandated compliance with Anti-Money-Laundering (AML) laws.  *See* 12 C.F.R. § 21.21.

104.    When monitoring its customers' accounts, Chase Bank obligated to comply with the Bank Secrecy Act (BSA), including regulations broadening its anti-money laundering provisions. The BSA requires Chase Bank to develop, administer and maintain a program to ensure compliance.  The program must be approved by the bank's board of directors and noted in the board meeting minutes.  It must (1) provide for a system of internal controls to ensure ongoing BSA compliance, (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance and (4) provide training for appropriate personnel.

105.    Chase Bank must also maintain a customer due diligence program to predict the types of transactions, dollar volume and transaction volume each customer is likely to conduct, thereby providing the bank with a means of identifying unusual or suspicious transactions for each customer.  The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

106.    Customer due diligence programs should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk, banks should gather additional information about the

customer and accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

107. Accordingly, Chase Bank implements its customer identification and due diligence programs in a manner that allows it to (i) know who is in charge of each account, (ii) the nature and purpose of the account and the customer's business, and (iii) the anticipated transactions that will be processed through the account, together with expected volume and frequency.

108. In connection with these programs and processes, Chase Bank has a senior bank official responsible for compliance with AML requirements. Chase Bank also has sector, regional, and legal entity AML compliance officers responsible for coordinating and monitoring day-to-day compliance.

109. The Federal Financial Institutions Examination Council ("FFIEC") sets standards and guidelines for banks to comply with their AML obligations. FFIEC publications describe certain "red flags" that indicate possible money laundering schemes and other misconduct requiring further inquiry. Chase Bank and its personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering indicia set forth in the Federal Financial Institutions Examination Council's BSA/AML Examination Manual. These include:

    a. "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

    b. "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

    c. "Unusual use of trust funds in business transactions or other financial activity."

    d. "Customer makes high value transactions not commensurate with the customer's known incomes."

    e. "A large volume of … funds transfers is deposited into … an account when the nature of the accountholder's business would not appear to justify such activity."

    f. "A retail business has dramatically different patterns of currency deposits from similar businesses in the same general location."

g. "Goods or services purchased by the business do not match the customer's stated line of business."

h. "Goods or services, if identified, do not match profile of company provided by respondent bank or character of the financial activity."

i. "Payments or receipts with no apparent links to legitimate contracts, goods, or services are received."

j. "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

k. "Funds transfers contain limited content and lack related party information."

l. "Funds transfers are sent or received from the same person to or from different accounts."

m. "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

n. "Multiple high-value payments or transfers between shell companies with no apparent legitimate business purpose."

o. "Purpose of shell company is unknown or unclear."

p. "Customer has established multiple accounts in various corporate or individual names that lack sufficient business purpose for the account complexities or appear to be an effort to hide the beneficial ownership from the bank."

q. "A large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations."

r. "Customer repeatedly uses a bank or branch location that is geographically distant from the customer's home or office without sufficient business purpose."

s. "Deposits are structured through multiple branches of the same bank or by groups of people who enter a single branch at the same time."

t.   "Funds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations."

u.   "Funds are sent or received via international transfers from or to higher-risk locations."

110.   To comply with FFIEC guidance and AML regulations, Chase Bank maintains systems to monitor accounts and account activity for improper activity.  This includes review, monitoring, and evaluation of transactions, the transacting parties, the parties' identity, and account patterns.  Chase Bank is further expected to consult external sources, such as the internet, commercial databases, and direct inquiries to evaluate the nature of suspicious transactions and the identities of the parties to the transactions.

111.   Chase Bank collects and maintains information about its customers and their banking behavior to, among other things, detect and prevent money laundering and fraud and to protect itself from liability to third parties and reputational injury.

112.   For this purpose, Chase Bank maintains procedures to determine the identity of each customer, 31 C.F.R. §§ 1020.220(a)(1), (2), and to collect information about the holder of each account, 31 C.F.R. § 1020.220(a)(2). When an entity rather than an individual opens an account, the bank obtains information about the individual who will control the account. 31 C.F.R. § 1020.220(a)(2)(ii)(C). The information that Chase Bank collects about new business account clients includes the purpose and nature of the business, anticipated activity in the account (*e.g.*, volume, value (number and dollar), and type of transaction), where the customer expects to transact business, and the products and services commonly used by the customer.

113.   Based on this information, as well as external resources like internet search engines and public and commercial record databases, Chase Bank creates an initial client profile and assigns a compliance-related risk rating. Neither the profile, nor the risk rating, is final or static. When Chase Bank learns that customer information has materially changed, its internal controls require updating that information and, where appropriate, reassessing the customer's risk profile or rating.  One of the ways in which the bank becomes aware of such changes is when the customer's transactions appear inconsistent with the bank's understanding of the nature and

purpose of the account—for instance, when there are significant, unexplained changes in account activity.

114.    Chase Bank also maintains internal controls to ensure ongoing compliance with federal AML laws and regulations. These include independent testing of the bank's compliance, regular monitoring of compliance, and training of personnel. These controls also include customer due diligence programs to prevent and detect money laundering.

115.    Through these programs, Chase Bank obtains information that gives it an understanding of the unique financial activity of its customers.  Likewise, Chase Bank can predict the type and frequency of transactions in which its customers are likely to engage, including the dollar volume and transaction volume typical of each account.  These datapoints are then used to identify unusual and suspicious transactions.

116.    Chase Bank provides AML training to all personnel whose duties may require such knowledge, including tellers and wire room personnel, to allow them to detect money laundering and fraud.  Supervising personnel then oversee the day-to-day issues and implementation of the Chase Bank's compliance structure at its individual branches.

117.    Many branch-level employees also regularly review Balance Fluctuation Reports. These reports highlight substantial balance fluctuations and list the account activity in certain accounts.

118.    Bank employees must also complete Currency Transaction Reports on any cash transactions exceeding $10,000.

119.    To complement these human efforts, Chase Bank uses its advanced transaction monitoring software portfolio, which includes Actimize, an artificial intelligence and data analytics software platform. Actimize markets its product as "entity-centric," and capable of revealing hidden connections and relationships between transacting parties across multiple accounts and transactions.

120.    Actimize automatically reviews transactions against customers' backgrounds and transaction histories, compares account activity against AML and other compliance red flags, and

automatically detects and analyzes abnormal or risky behavior.  When the software identifies activity warranting further review or escalation, it alerts bank personnel.

121.    Here, Chase Bank conducted due diligence and engaged in a Know Your Customer analysis of the Receivership Entities and Acharya, and monitored the Receivership Entities' accounts for anomalous or suspicious behavior.  Chase Bank collected and reviewed information about the Receivership Entities' business operations, the source of their funds, and the purpose of their accounts.  In doing so, it formed expectations about the proper use of the Receivership Entities' accounts.

122.    Further, Chase Bank knows what its employees know, including J.E.

123.    Chase Bank knew that Acharya was president, CEO, and manager of the Receivership Entities and owed fiduciary duties to the Receivership Entities.

124.    Chase Bank also understood the claimed business model: to raise money from investors and use it to complete and sell real estate projects to generate money to repay investors. Chase Bank, therefore, should have seen banking activity consistent with this business model. That is, the banking activity should have reflected its receipt of investor funds for a specific project, use of those funds to purchase and complete the specific project invested in, receipt of proceeds from the sale of the projects, and use of those funds to pay returns to investors.

125.    But that was not what Chase Bank saw.  Instead, it saw a great deal of investor money and loans entering the Receivership Entities' accounts and an array of banking activities blatantly at odds with the claimed business model.

126.    Chase Bank saw rapid movement of funds through multiple accounts often on the same day, sometimes within minutes.  Acharya diverted the Receivership Entities' funds to cover the debts and needs of other Receivership Entities.  The accounts were constantly overdrawn, and transfers from Receivership Entities were needed to cover outgoing transfers from other Receivership Entities.  Often, the funds ultimately benefited a different entity or project than had been intended by the lender or investor that had contributed the funds and commingled with cash belonging to other projects.  At times, funds intended for investment in the Receivership Entities were transferred to Acharya's personal account, which was also held at Chase Bank.

127.   The volume of funds passing through the Receivership Entities' accounts reflected a material disparity between what Chase Bank expected from the operation of the businesses and Acharya's use of the account.

128.   The account activity was rife with wire fraud and money laundering, generating hundreds of insufficient funds notices and triggering other alerts.

129.   As a further example of banking activity that conflicted with the Receivership Entities' business model, one would expect to see proceeds from the sale of projects.  According to the SEC, since August 2016, the Receivership Entities exited all but one of its real estate projects without realizing *any* profits.  Nevertheless, Acharya used funds invested in the Receivership Entities to pay false returns to other investors.  According to the SEC, Acharya paid over $21 million in bridge fund interest payments, purportedly from the profits on projects, during years in which all but one of its projects were either over-budget or defunct.

130.   Chase Bank observed and actively participated in banking behavior that contradicted the stated operation and actively assisted the misappropriation and siphoning of funds by Acharya.  Chase Bank knew that such actions with the Receivership Entities' funds were improper and harming the Receivership Entities.

131.   Acharya's improper use of the accounts was apparent.  Yet, Chase Bank facilitated this use for years and through countless transactions involving tens of millions of dollars.

132.   These disparities implicated various FFIEC red flags for the accounts, which Chase Bank was monitoring for such purpose, including:

    a.   "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

    b.   "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

    c.   "Unusual use of trust funds in business transactions or other financial activity."

    d.   "Customer makes high value transactions not commensurate with the customer's known incomes."

    e.   "A large volume of … funds transfers is deposited into … an account when the nature of the accountholder's business would not appear to justify such activity."

f.  "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

g.  "Funds transfers contain limited content and lack related party information."

h.  "Funds transfers are sent or received from the same person to or from different accounts."

i.  "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

j.  "A large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations."

133.  Chase Bank, through its employees' interactions with Acharya, its direct oversight, or its compliance processes, observed the improper use of the Receivership Entities' funds through the Chase Bank accounts.

134.  Despite its knowledge of fraud, Chase Bank failed to timely act upon the accounts. Chase Bank continued to accept deposits of investor money and carry out the transfers needed to consummate the fraud, misappropriate the Receivership Entities' funds, and drive them deeper and deeper into debt.

135.  Chase Bank's actions and inaction were integral to the scheme.  Acharya could not have carried out the scheme without first raising a large amount of funds from investors and then depositing and transferring those funds among bank accounts.  Acharya's use of the Chase Bank accounts to commingle investor money enabled him to use new money to pay older investors in a Ponzi-like fashion, instead of funding payments with profits earned from the sale of the projects.

136.  Had J.E. and Chase Bank not knowingly and substantially assisted the scheme from its inception, and/or had closed the Receivership Entities' accounts at Chase Bank early on, the Receivership Entities would not have been damaged.

137.  Chase Bank benefitted from the continued use of the accounts, which generated significant fees and the use of millions of dollars in deposits.

**III.     The Fraudulent Scheme Continued Uninterrupted Until the Government Intervened**

138.     The fraudulent scheme continued until 2021, with accounts at Chase Bank at the core of the scheme.  Despite admitting that he had been raising money under false pretenses for an unprofitable enterprise reliant on new investor funds to pay existing investors, Acharya continued soliciting investors for the Receivership Entities until he was enjoined by the Court in the SEC Action.

139.     On December 21, 2020, the SEC filed a civil complaint for injunctive and other relief in the United States District Court for the Northern District of California against Acharya and Silicon Sage Builders.  The complaint charges that Acharya ran a fraudulent scheme, made material misrepresentations to investors regarding the use of funds, profitability, source of payments, redemption rights, and the amount of the Bridge Fund offering, misused investor funds, made Ponzi-like payments, and duped existing investors to contribute new capital, roll over existing investments, and defer interest payments.

140.     Thereafter, the SEC obtained an injunction and appointment of the Receiver over all the Receivership Entities on February 10, 2021.  The Court in the SEC action found "[good cause exists to believe that unless restrained and enjoined by order of this Court, defendants will dissipate, conceal, or transfers assets which could be subject to an order directing disgorgement or the payment of civil money penalties in this action."  (SEC Action D.E. 64 at ¶ 6).

141.     At that point, the damage was already done.  The Receivership Entities had taken in and spent at least $119 million from hundreds of investors, not earned any real revenue, had made Ponzi-like payments to investors—all while remaining indebted to investors and lenders.

142.     Upon his appointment, the Receiver was granted "all powers, authorities, rights, and privileges heretofore possessed by the officers, directors, managers, and general and limited partners of the Receivership Entities under applicable state and federal law, by the governing charters, by-laws, articles, and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959, and 1692, and Fed. R. Civ. P. 66."  (SEC Action D.E. 63 ¶ 8).  As a result, the prior partners,

officers, directors, and/or managers of the Receivership Entities were ousted and currently wield no authority over the Receivership Entities. (*See id.* at ¶ 5).

143. The Receiver is charged with, among other tasks, marshaling and preserving the assets of the Receivership Estate and investigating and prosecuting claims against third parties. (*See id.* § IX). The Receiver is authorized and directed to "investigate the manner in which the financial and business affairs of the Receivership Defendants were conducted and (after obtaining leave of this Court) to institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate." (*Id.* at ¶ 42).

144. As of the date of the Receiver's appointment, the Receivership Entities had 62 bank accounts at Chase Bank with a cumulative negative cash balance of -$6,321.

145. The Receiver estimates a significant loss due to Acharya's misuse and misappropriation of Receivership Funds. The Receiver contends over $100 million is necessary to make the Receivership Entities whole and pay liabilities due to investors who transacted with the Receivership Entities.

146. On March 21, 2021, the Court in the SEC Action entered a consent judgment against Acharya.

147. On August 14, 2023, the Court in the SEC Action granted the Receiver's request for permission to engage undersigned counsel and bring a lawsuit against Chase Bank. (SEC Action at D.E. 529).

148. The Receiver therefore brings this action to hold Chase Bank accountable for knowingly facilitating and assisting Acharya's wrongful and unlawful conduct.

**<u>COUNT I – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY</u>**

149. The Receiver realleges and incorporates by reference paragraphs 1 through 148 above as if fully set forth herein.

150. Acharya owed a fiduciary duty to the Receivership Entities. Specifically, as president, CEO, and manager, Acharya owed the Receivership Entities fiduciary duties of care and loyalty. Acharya was required to use, maintain, and deploy the Receivership Entities' funds in their best interests.

151.    Acharya breached his fiduciary duties to the Receivership Entities.  Instead of using the Receivership Entities' funds for their intended purpose, Acharya ran a fraudulent scheme with those funds, misdirecting the Receivership Entities' funds to other projects, to cover the needs of other Receivership Entities, and to pay false returns to investors.  The Bridge Fund was—contrary to its stated purpose to lend money to finance real estate projects—actually used to pay other investors' interest.  As a result of this misappropriation, the Receivership Entities relied on a constant influx of new investor funds, driving the Receivership Entities further and further into debt without making profits.  Such use of the Receivership Entities' funds was detrimental to the Receivership Entities and drove them deeper into debt.

152.    Chase Bank knew that Acharya was breaching his fiduciary duties to the Receivership Entities and of its role in promoting Acharya's breaches.

153.    Based on Chase Bank's employee's extensive contact with Acharya and his agents during account opening and administration and Chase Bank's active monitoring of the Receivership Entities' accounts, Chase Bank knew that Acharya owned, managed, and controlled the Receivership Entities and thus owed them fiduciary duties.

154.    Chase Bank also observed firsthand Acharya operating a fraudulent scheme with the Receivership Entities' funds.  J.E. was heavily involved with, monitored, and witnessed the Receivership Entities' account activity, which showed the misappropriation of Receivership Entity funds and Ponzi-like payments.  Notably absent from such account activity were transfers indicating profits on the projects.

155.    Because he was misusing their funds, Chase Bank knew that Acharya was breaching his fiduciary duties to the Receivership Entities.

156.    Chase Bank nonetheless knowingly and substantially assisted Acharya in breaching his fiduciary duties to the Receivership Entities.  Chase Bank allowed the accounts to be used in a manner that bore no reasonable resemblance to the stated business model.  Chase Bank facilitated, accommodated, and did not impede or stop Acharya's movement of funds, as described above, despite knowing the duties owed by Acharya.  Chase Bank executed all transactions requested by

Acharya and went above and beyond to accommodate the misuse of the accounts using atypical banking procedures.

157.     Chase Bank substantially benefited from assisting Acharya.  Chase Bank, through its banking relationship with Acharya, earned income from fees and from its possession of deposits and transaction fees.

158.     As a direct and proximate result of Acharya's breaches and Chase Bank's assistance thereof, the Receivership Entities suffered damages in an amount to be determined at trial.  The Receivership Entities' funds were misdirected and/or used to pay fake profits.  The Receivership Entities thus lost their funds and now face significant liability to investors.

159.     Chase Bank's conduct, as alleged herein, was knowing, oppressive, malicious, and in conscious disregard of the rights of the Receivership Entities. An award of punitive and/or exemplary damages is therefore appropriate against Chase Bank.

## COUNT II – AIDING AND ABETTING FRAUD

160.     The Receiver realleges and incorporates by reference paragraphs 1 through 148 above as if fully set forth herein.

161.     Acharya defrauded the Receivership Entities.  Instead of using the Receivership Entities' funds for their intended purpose, Acharya ran a fraudulent scheme with those funds, misdirecting the Receivership Entities' funds to other projects, to cover the needs of other Receivership Entities, and to pay false returns to investors.  The Bridge Fund was—contrary to its stated purpose to lend money to finance real estate projects—actually used to pay other investors' interest.  As a result of this misappropriation, the Receivership Entities relied on a constant influx of new investor funds, driving the Receivership Entities further and further into debt without making profits.  Such use of the Receivership Entities' funds was detrimental to the Receivership Entities and drove them deeper into debt.  Acharya thus made false statements of material facts and omissions on which the Receivership Entities relied to their detriment.

162.     Chase Bank was aware that Acharya was defrauding the Receivership Entities and of its role in promoting Acharya's fraud.

163.    As explained above, Chase Bank learned early on that Acharya owned, managed, and controlled the Receivership Entities.  Based on Chase Bank's contact with Acharya during account opening and administration, and Chase Bank's due diligence and monitoring of the accounts, including its review of AML red flags caused by Acharya's account activity, Chase Bank knew that Acharya was taking in money from investors and loans for the purpose of financing the Receivership Entities' respective projects.

164.    Chase Bank also observed firsthand Acharya operating a fraudulent scheme with the Receivership Entities' funds, instead of using the funds as promised.  Chase Bank, through J.E. and other employee's active involvement and monitoring of the accounts, Chase Bank's due diligence, and following up on red flags raised by personnel and/or its systems, Chase Bank witnessed the account activity that showed misappropriation of Receivership Entity funds and Ponzi-like payments. Notably absent from such account activity were any transfers indicating profits on projects.  Because the account activity showed misuse of the Receivership Entities' funds, Chase Bank knew that Beasley was defrauding the Receivership Entities.

165.    Chase Bank nonetheless knowingly and substantially assisted Acharya in defrauding the Receivership Entities.  Chase Bank allowed the accounts to be used in a manner that bore no reasonable resemblance to the stated business model.  Chase Bank facilitated, accommodated, and did not impede or stop Acharya's movement of funds, as described above. Chase Bank executed all transactions requested by Acharya and went above and beyond to accommodate the misuse of the accounts using atypical banking procedures.

166.    Chase Bank substantially benefited from assisting Acharya.  Chase Bank, through its banking relationship with Acharya, earned income from fees and from its possession of deposits.

167.    As a direct and proximate result of Acharya's fraud and Chase Bank's assistance thereof, the Receivership Entities suffered damages in an amount to be determined at trial.  The Receivership Entities' funds were misdirected and/or used to pay fake profits.  The Receivership Entities thus lost their funds and now face significant liability to investors.

168.    Chase Bank's conduct, as alleged herein, was knowing, oppressive, malicious, and in conscious disregard of the rights of the Receivership Entities. An award of punitive and/or exemplary damages is therefore appropriate against Chase Bank.

## COUNT III – AIDING AND ABETTING CONVERSION

169.    The Receiver realleges and incorporates by reference paragraphs 1 through 148 above as if fully set forth herein.

170.    Acharya converted millions of dollars of the Receivership Entities.  On information and belief, the Receivership Entities' accounts were used exclusively to transact with the Receivership Entities' funds, rendering all funds processed through the accounts identifiable. Specifically, Acharya caused various transfers from the Receivership Entities' accounts, which contained the Receivership Entities' funds, into his personal account or accounts belonging to other Receivership Entities.  In addition, Acharya used funds intended for investment in the Receivership Entities to pay false investor returns.   The Bridge Fund was—contrary to its stated purpose to lend money to finance real estate projects—actually used to pay other investors' interest.

171.    Such transfers and withdrawals were unauthorized or premised on fraud.  Acharya thus exercised wrongful dominion over the Receivership Entities' funds in denial of, or inconsistent with, the Receivership Entities' title or rights therein or in derogation, exclusion, or defiance of such rights.

172.    Chase Bank was aware that Acharya was converting the Receivership Entities' funds and of its role in promoting Acharya's conversion.

173.    As explained above, Chase Bank learned early on that Acharya owned, managed, and controlled the Receivership Entities.  Based on Chase Bank's contact with Acharya during account opening and administration, and Chase Bank's due diligence and monitoring of the accounts, including its review of AML red flags caused by Acharya's account activity, Chase Bank knew that Acharya was taking in money from investors and loans for the purpose of financing the Receivership Entities' respective projects.  Chase Bank thus knew that the funds in the accounts belonged to the Receivership Entities.

174.    Chase Bank also observed firsthand Acharya operating a fraudulent scheme with the Receivership Entities' funds, instead of using the funds as promised.  Chase Bank, through J.E. and other employee's active involvement and monitoring of the accounts, its due diligence, and its follow-up on red flags raised by personnel and/or its systems, witnessed the account activity that showed misappropriation of Receivership Entity funds and Ponzi-like payments. Notably absent from such account activity were any transfers indicating profits on projects.  Because the account activity showed misuse of the Receivership Entities' funds, Chase Bank knew that Acharya was defrauding the Receivership Entities.  Under the circumstances observed, Chase Bank knew that such withdrawals and transfers were unauthorized and/or premised on fraud and thus contrary to the Receivership Entities rights in and title to the funds.

175.    Chase Bank nonetheless knowingly and substantially assisted Acharya's conversion.  Chase Bank allowed the accounts to be used in a manner that bore no reasonable resemblance to the stated business model.  Chase Bank facilitated, accommodated, and did not impede or stop Acharya's movement of funds, as described above.  Chase Bank executed all transactions requested by Acharya and went above and beyond to accommodate the misuse of the accounts using atypical banking procedures.

176.    Chase Bank substantially benefited from assisting Acharya.  Chase Bank earned income from fees and from its possession of deposits.

177.    As a direct and proximate result of Acharya's conversion and Chase Bank's assistance thereof, the Receivership Entities suffered damages in an amount to be determined at trial. The Receivership Entities' funds were misdirected and/or used to pay false investor returns. The Receivership Entities thus lost their funds and now face significant liability to investors.

178.    Chase Bank's conduct, as alleged herein, was knowing, oppressive, malicious, and in conscious disregard of the rights of the Receivership Entities. An award of punitive and/or exemplary damages is therefore appropriate against Chase Bank.

**COUNT IV – UNJUST ENRICHMENT**

179.    The Receiver realleges and incorporates by reference paragraphs 1 through 148 above as if fully set forth herein.

180.    Chase Bank provided account services to Acharya, and those accounts were used to carry out the fraudulent scheme.

181.    The funds held in the accounts belonged to the Receivership Entities.  Thus, the Receivership Entities conferred benefits upon Chase Bank in the form of deposits from which Defendants generated income, including but not limited to interest, transfer fees, service fees, transaction fees and online banking fees.  Chase Bank knowingly and voluntarily accepted, and retained, the deposits and those benefits.

182.    Because Chase Bank aided and abetted Acharya's fraud, breach of fiduciary duty, and conversion, it would be inequitable for Chase Bank to retain the benefits it generated from the Receivership Entities.

## **REQUEST FOR RELIEF**

WHEREFORE, the Receiver requests entry of a judgment against Chase Bank awarding the following relief:

a.   An award of damages and all other available monetary relief, including pre-judgment interest, on each claim and in an amount to be established at trial;

b.   An award of punitive damages in an amount to be established at trial;

c.   An award of reasonable attorneys' fees and costs; and

d.   Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

The Receiver demands a trial by jury on all issues so triable.


Dated August 9, 2024

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**REISER LAW, P.C.**
Michael J. Reiser, Esq. (Bar No. 133621)
michael@reiserlaw.com
Matthew Reiser, Esq. (Bar No. 315301)
matthew@reiserlaw.com
Isabella Martinez, Esq. (Bar No. 315299)
1990 N. California Blvd, 8th Floor
Walnut Creek, CA 94596
Telephone: (925) 256-0400
Facsimile: (925) 476-0304

*/s/ Michael J. Reiser*


**LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP**
Jeffrey C. Schneider, Esq.
Florida Bar No. 933244
(*pro hac vice forthcoming*)
jcs@lklsg.com
Victoria J. Wilson, Esq.
Florida Bar No. 92157
(*pro hac vice forthcoming*)
vjw@lklsg.com
Marcelo Diaz-Cortes, Esq.
Florida Bar No. 118166
(*pro hac vice forthcoming*)
md@lklsg.com
100 SE 2nd Street
Miami Tower, 36th Floor
Miami, Florida 33131
Telephone: (305) 403-8788
Facsimile:  (305) 403-8789
*Attorneys for Plaintiff*