1

2

3

4

5          IN THE UNITED STATES DISTRICT COURT

6          FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   DAVID STAPLETON, as court-                Case No.  24-cv-04947 (CRB)
    appointed receiver for SILICON SAGE
9   BUILDERS LLC,                             **ORDER GRANTING IN PART AND
                                              DENYING IN PART MOTION TO
10              Plaintiff,                     DISMISS**

11         v.

12  JPMORGAN CHASE BANK, N.A.,

13              Defendant.

14         This action is related to a separate lawsuit filed by the Securities and Exchange

15  Commission (SEC) against Sanjeev Acharya and his company, Silicon Sage Builders, LLC

16  (Silicon Sage).  See generally SEC v. Silicon Sage Builders, LLC, No. 20-CV-9247-CRB,

17  2021 WL 1041618 (N.D. Cal. Feb. 10, 2021).  On February 10, 2021, Judge Illston

18  appointed Plaintiff David Stapleton as Receiver of Silicon Sage and its affiliates

19  (Receivership Entities).  See Order Granting Appointment (dkt. 63) in Silicon Sage, No.

20  20-CV-9247.[1]  Stapleton brings this suit against JPMorgan Chase Bank, N.A. (Chase) on

21  behalf of the Receivership Entities, alleging that Chase aided and abetted Acharya in

22  breach of fiduciary duties, fraud, and conversion, resulting in unjust enrichment and

23  leaving the Receivership Entities insolvent.  Compl. (dkt. 1) ¶¶ 31–37.  Chase moves to

24  dismiss these claims under Rules 12(b)(1) and 12(b)(6) of the Federal Civil Rules of

25  Procedure.  See Mot. (dkt. 19).  As explained below, the Court **GRANTS** in part and

26  **DENIES** in part Chase's motion.

27  _____

28  [1] That case was subsequently reassigned to this Court.  See Order Reassigning Case (dkt. 594) in Silicon Sage, No. 20-CV-9247.

United States District Court
Northern District of California

I.    **BACKGROUND**

A.    **Factual Background**

Since August 2016, Acharya raised over "$119 million from over 250 investors" for his real estate development company, Silicon Sage, and its subsidiaries and affiliates. Compl. ¶¶ 10–14.  As founder, president, CEO, and manager of Silicon Sage, Acharya had complete dominion and control over the Receivership Entities and their finances.  Id. ¶¶ 12, 61, 150.  Stapleton alleges that Acharya used the Receivership Entities to orchestrate a massive fraudulent scheme that left the Receivership Entities insolvent.  Id. ¶¶ 39–41, 51.  Acharya operated the enterprise using Chase bank accounts held by the Receivership Entities.  Id. ¶¶ 60, 61.  Stapleton alleges that to elicit investments for the scheme, Acharya told investors that his real estate projects were profitable, but in reality, "the Receivership Entities had exited all but one of their real estate projects without realizing any profits."  Id. ¶¶ 34–36.  Acharya used equity interests, membership interests, and promissory notes to solicit investments for Silicon Sage until the SEC obtained an injunction against Acharya and Silicon Sage on February 10, 2021.  See Silicon Sage, No. 20-CV-9247; Compl. ¶¶ 18–33, 138–40.

Stapleton further alleges that Chase aided and abetted Acharya's scheme.  Id. ¶¶ 97, 134–36.  Specifically, Stapleton alleges that Acharya used Chase bank accounts held by the Receivership Entities to make improper inter-entity transfers, transfers to himself, and payments for false returns to investors in furtherance of the scheme.  Id. ¶¶ 38–42, 71. Stapleton also alleges that Chase knowingly executed deceptive transactions and went beyond the scope of ordinary banking services to substantially assist in Acharya's scheme. Id. ¶¶ 65–68, 73–83.  For example, Stapleton alleges that the Business Relationship Manager for the Chase accounts, J.E., and other Chase employees knew that Acharya inappropriately transferred and commingled funds across accounts and, rather than report Acharya's fraudulent conduct, assisted Acharya in bypassing Chase's internal deposit processing system, clearing deposits before the holding period, and circumventing fraud detection procedures.  Id. ¶¶ 76, 83, 86.

2

Stapleton alleges too that, notwithstanding Federal Financial Institutions Examination Council (FFIEC) guidance and Anti-Money Laundering (AML) regulations, Chase continued to accept deposits and carry out transfers needed to consummate the fraud, driving the Receivership Entities further into debt.  Id. ¶¶ 116–34.  Chase allegedly benefited from Acharya's fraudulent conduct through significant fees generated from deposits to the bank.  Id. ¶¶ 99, 137.  Stapleton alleges that, had J.E. and other Chase employees not knowingly assisted in Acharya's scheme, the Receivership Entities would not have been damaged.  Id. ¶ 136.

### B.    Procedural Background

On December 21, 2020, the SEC filed a civil complaint for injunctive and other relief against Acharya and Silicon Sage and its subsidiaries and affiliates.  See generally Original Compl. (dkt. 1) in Silicon Sage, No. 20-CV-9247.  Judge Illston granted the injunction and appointed Stapleton as Receiver of the Receivership Entities on February 10, 2021.  See Order Granting Injunction (dkt. 64) in Silicon Sage, No. 20-CV-9247; Order Granting Appointment (dkt. 63) in Silicon Sage, No. 20-CV-9247.  As Receiver, Stapleton "shall assume and control the operation of the Receivership Entities and shall pursue and preserve all of their claims."  Id. at 4.  On August 9, 2024, Stapleton filed this action against Chase for aiding and abetting breach of fiduciary duties, aiding and abetting fraud, aiding and abetting conversion, and unjust enrichment.  See generally Compl.  On December 6, 2024, Chase filed a motion to dismiss based on standing and failure to state a claim.  See Mot.  On January 10, 2025, Stapleton filed his response.  See Response (dkt. 24).  On January 31, 2025, Chase filed its reply.  See Reply (dkt. 29).  The Court finds this matter suitable for resolution without oral argument and therefore vacated the hearing previously set.  See Clerk's Notice (dkt. 34).

## II.    LEGAL STANDARD

### A.    Standing

"The doctrine of standing limits federal judicial power."  Or. Advocacy Ctr. v. Mink, 332 F.3d 1101, 1108 (9th Cir. 2003).  The question of whether plaintiffs have

standing "precedes, and does not require, analysis of the merits." <u>Equity Lifestyle Props., Inc. v. Cnty. of San Luis Obispo</u>, 548 F.3d 1184, 1189 n.10 (9th Cir. 2008). "[S]tanding . . . pertain[s] to a federal court's subject-matter jurisdiction under Article III, [and is] properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1)." <u>White v. Lee</u>, 227 F.3d 1214, 1242 (9th Cir. 2000).

To have standing, a plaintiff must establish that (1) they have suffered an injury-in-fact, (2) their injury is traceable to a defendant's conduct, and (3) their injury would likely be redressed by a favorable decision. <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560–61 (1992). Each of these elements must be supported "with the manner and degree of evidence required at the successive stages of the litigation." <u>Id.</u> at 561. A plaintiff "must have standing to seek each form of relief requested in the complaint." <u>Town of Chester v. Laroe Estates, Inc.</u>, 581 U.S. 433, 439 (2017).

### B.    Failure to State a Claim

Pursuant to Rule 12(b)(6), courts may dismiss a complaint for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). Courts may base dismissal on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." <u>Godecke v. Kinetic Concepts, Inc.</u>, 937 F.3d 1201, 1208 (9th Cir. 2019) (citation omitted). A complaint must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u>

## III.    DISCUSSION

Chase makes four arguments in support of dismissal. First, Chase argues that Stapleton lacks Article III standing to bring his claims because the Receivership Entities have not suffered an injury. Mot. at 3–14. Second, Chase argues that Stapleton lacks

4

prudential standing because he is bringing claims on behalf of investors rather than on behalf of the Receivership Entities. <u>Id.</u> at 15. Third, Chase argues that the claims are barred by the applicable statute of limitations. <u>Id.</u> at 15–18. Fourth, Chase argues that Stapleton has not pleaded facts sufficient to support a claim for unjust enrichment. <u>Id.</u> at 18–20.

### A.    Article III Standing

Chase's first argument is that Stapleton lacks standing to bring the claims asserted. Mot. at 4–10. To have standing, a party must establish that they have suffered an injury-in-fact. <u>Lujan</u>, 504 U.S. at 560–61. A receiver may only assert claims that the receivership entities themselves have standing to pursue. <u>Smith v. Arthur Andersen LLP</u>, 421 F.3d 989, 1003 (9th Cir. 2005). "[E]ven if the [r]eceiver's actions ultimately benefit the receivership entity's creditors . . . the [r]eceiver stands in the shoes of the receivership entities, not in the shoes of the creditors." <u>Winkler v. McCloskey</u>, 83 F.4th 720, 727 (9th Cir. 2023). Thus, so long as an entity in receivership has suffered a harm, a receiver has standing to pursue a claim for such injuries. <u>Mosier v. Stonefield Josephson, Inc.</u>, 815 F.3d 1161, 1166 (9th Cir. 2016).

Chase argues that Stapleton lacks standing to bring tort claims against Chase because the Receivership Entities on whose behalf Stapleton brings the claims participated in the fraud that gives rise to those claims. Mot. at 6. Chase contends that, as architects of the fraud, the Receivership Entities did not suffer an injury, and because Stapleton stands in the shoes of the Receivership Entities, he did not suffer an injury either, and therefore lacks standing. Mot. 7–8. Chase's arguments, which rely on authority from the Second, Seventh, and Eleventh Circuits, are unpersuasive.

### 1.    Whether the Second Circuit's <u>Wagoner</u> rule applies

Chase relies on the Second Circuit's <u>Wagoner</u> rule, which it argues California has adopted. Mot. at 8. That rule imputes the wrongdoing of a corporation to a trustee of that corporation when bad actors controlled and dominated the corporation. <u>Id.</u> (citing <u>Shearson Lehman Hutton, Inc. v. Wagoner</u>, 944 F.2 114, 120 (2d Cir. 1991) ("A claim

5

against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation.")).  Chase contends that as the president, CEO, and manager of Silicon Sage, Acharya had "complete control and dominion" over the Receivership Entities.  See id. at 9 (citing Compl. ¶ 5).  Accordingly, Chase argues, the wrongdoing of the Receivership Entities is imputed to Stapleton.  Id.

Stapleton responds that Chase is conflating standing with the affirmative defense of in pari delicto or unclean hands.[2]  Response at 3.  Stapleton contends that he has established standing because Acharya and Chase's conduct financially harmed the Receivership Entities.  Id. at 3–4 (citing McHale v. Silicon Valley L. Grp., 919 F.Supp. 2d 1045, 1053 (N.D. Cal. 2013)).  In McHale, Judge Spero declined to follow the Wagoner rule and concluded that a cognizable injury is suffered when a third party causes a company to deepen its insolvency or increase its liabilities.  919 F.Supp 2d at 1052–53 (adding that Wagoner "is heavily criticized by courts outside the Second Circuit for mixing issues of standing with the defense of in pari delicto").  Stapleton's argument prevails.

Chase attempts to demonstrate that California courts have adopted the Second Circuit's Wagoner rule by citing two California appellate cases in which a bankruptcy trustee pursued tort claims against a third party on behalf of a corporation.[3]  See Mot. at 8 (citing Peregrine Funding, Inc. v. Sheppard Mullin Ritcher & Hampton LLP, 133 Cal. App. 4th 658, 677 (2005) and Casey v. U.S. Bank Nat. Assn., 127 Cal. App. 4th 1138, 1143–44 (2005)).  But these cases do not support Chase's argument for two reasons.  First, standing for a trustee differs from that of a receiver: "[a] receiver's authority derives from the court's equitable power," whereas a trustee has statutory authority to act on behalf of

---

[2]  Under California law, "'[t]he doctrine of in pari delicto dictates that when a participant in illegal, fraudulent, or inequitable conduct seeks to recover from another participant in that conduct, the parties are deemed in pari delicto, and the law will aid neither, but rather, will leave them where it finds them.'"  In re Mortg. Fund '08 LLC, 527 B.R. 351, 366 (N.D. Cal. 2015) (quoting Casey v. U.S. Bank Nat. Assn., 127 Cal. App. 4th 1138, 1143 n.1 (2005)).

[3]  California law governs the imputation of knowledge to corporate victims of alleged torts. O'Melveny & Myers v. F.D.I.C., 512 U.S. 79, 84 (1994).  However, federal courts may resolve disputes as to what the law provides.  Id. at 89.

creditors to avoid the transfer of property by a debtor.  Winkler, 83 F.4th at 725–26; see also Uecker v. Zentil, 244 Cal. App. 4th 789, 798 (2016) ("unlike bankruptcy trustees, receivers are not subject to the limits of section 541.").  Second, neither case adopted the Wagoner rule to deprive the trustee of standing.  See Peregrine Funding, Inc., 133 Cal. App. 4th at 677; Casey, 127 Cal. App. 4th at 1141.

Both courts concluded that the complaint did not provide an adequate basis for imputing the inequitable conduct of corporate officers to the corporation.  See Peregrine Funding, 133 Cal. App. 4th at 679; Casey, 127 Cal. App. 4th at 1144.  In Peregrine, the court reasoned that the complaint did not describe the corporations as a "sham" or that the corporations were "mere alter egos of the perpetrators of the Ponzi scheme."  Peregrine Funding, 133 Cal. App. 4th at 678.  The court was reluctant to read such allegations into the complaint.  Id. at 679.  Similarly, in Casey, the court concluded that the lower court erred in dismissing the trustee's claims pursuant to Wagoner.  Casey, 127 Cal. App. 4th at 1144.  The complaint in that case did not disclose "who owns [the corporation], the composition of its board of directors, or how many additional officers the corporation has," making it impossible to determine whether all relevant decisionmakers were involved in the fraud.  Id. at 1143.  Nor did the complaint allege that the corporation acted as the alter ego to fraudulent actors or that it was so "dominated and controlled" by such actors that their wrongdoing should be imputed to the corporation.  Id. at 1143–44.  Accordingly, the Wagoner rule did not bar the trustee's claims in Casey.  Id. at 1144.

Here, there might be an adequate factual basis to impute Acharya's conduct to the Receivership Entities.  The complaint expressly states that Acharya had "complete dominion and control over the Receivership Entities and their finances."  Compl. ¶ 5.  The complaint does not allege that the Receivership Entities acted as Acharya's "alter egos" or that the real estate business was a "sham" with the "sole purpose" of defrauding investors.  Compare Compl. with Peregrine Funding, 133 Cal. App. 4th at 678–79.  But the complaint in the SEC action alleged that "Acharya controls Silicon Sage" and that "[b]ecause Acharya is Silicon Sage's manager, founder and owner, and because he solicited all of the

7

investors' monies on behalf of the enterprise, his scienter, conduct, and statements may be imputed to Silicon Sage." Original Compl. ¶¶ 159, 166 in <u>Silicon Sage</u>, No. 20-CV-9247.

Whether Acharya's conduct is imputed to Stapleton is a separate issue, however. Chase argues that, under the <u>Wagoner</u> rule, if the Court imputes Acharya's conduct to the Receivership Entities, then it also imputes that conduct to Stapleton. Mot. at 8–10. But California courts have not adopted the <u>Wagoner</u> rule to impute inequitable conduct to receivers. In an unpublished decision, the Ninth Circuit expressly disavowed its application. <u>See</u> <u>CarrAmerica Reality Corp. v. Nvidia Corp.</u>, 302 F.App'x 514, 517 (9th Cir. 2008) ("the <u>Wagoner</u> rule has been much criticized and we decline to follow it.");[4] <u>see also</u> <u>Donell v. Nixon Peabody LLP</u>, No. CV 12-04084 DDP JEMX WL 3839402, at *5 (C.D. Cal. Sept. 5, 2012) ("the Ninth Circuit has never adopted the <u>Wagoner</u> rule, and expressly declined to follow it [in <u>CarrAmerica</u>] . . . Accordingly, the court declines to adopt the <u>Wagoner</u> rule and dismiss the Receiver's action for lack of standing."). Similarly, the Court declines to adopt the <u>Wagoner</u> rule here.

### 2. Whether the Seventh and Eleventh Circuit's framework applies

Chase further relies on <u>Isaiah</u>, an Eleventh Circuit case, to argue that because Acharya orchestrated the fraud, Stapleton lacks standing to bring claims against a third party that allegedly aided and abetted the fraud. <u>See</u> Mot. at 5–6 (citing <u>Isaiah v. JPMorgan Chase Bank, N.A.</u>, 960 F.3d 1296, 1300–06 (11th Cir. 2020)). In <u>Isaiah</u>, the court concluded that "[t]he corporation—and the receiver who stands in the shoes of the corporation—lacks standing to pursue such tort claims because the corporation, 'whose primary existence was as a perpetrator of the Ponzi scheme, cannot be said to have suffered injury from the scheme it perpetrated.'" 960 F.3d at 1306 (citations omitted). The court reasoned that where "[t]he Receivership Entities were wholly dominated by persons engaged in wrongdoing" and there is no allegation in the complaint that the

---

[4] Courts tend to criticize the <u>Wagoner</u> rule for characterizing the <u>in pari delicto</u>/unclean hands defense as a standing issue. <u>See, e.g.</u>, <u>In re Senior Cottages of Am., LLC</u>, 482 F.3d 997, 1003 (8th Cir. 2007).

"Receivership Entities engaged in any legitimate activities," the fraud and intentional torts of insiders cannot be separated from the corporation. Id. at 1306–07. Therefore, the Eleventh Circuit held that the corporation's wrongdoing is imputed to the receiver, who consequently lacks standing to bring tort claims against third parties on behalf of the Receivership Entities. Id. at 1307–08.

The court separately concluded that, even though the receiver lacked standing to bring tort claims against third parties, the receiver still had standing to bring claims for fraudulent conveyance on behalf of the receivership entities. Id. at 1301–02. This is because circuit courts generally agree that even where a Ponzi schemer controls the corporation, a receiver of the corporation must have standing to bring claims for fraudulent conveyance. See Winkler, 83 F.4th at 727 ("[A] receiver has standing to pursue a fraudulent transfer claim because the receiver is acting on behalf of the receivership entity, seeking to claw back transfers that the perpetrator of the scheme fraudulently made to the net winners."); Wiand v. Lee, 753 F.3d 1194, 1202 (11th Cir. 2014) (holding that a receiver has standing to sue on behalf of the receivership entities for fraudulent transfers even where the bad actor controlled and managed the receivership entities); Knauer v. Jonathon Roberts Fin. Grp., Inc., 348 F.3d 230, 236 (7th Cir. 2003) ("The rule that a receiver stands precisely in the shoes of the corporation is . . . subject to the exception that the receiver so far represents the general creditors that he may avoid transactions in fraud of their rights.").

The exception for fraudulent conveyances is consistent with the Uniform Fraudulent Transfer Act (UFTA), which provides a receiver the right to bring a claim to recover funds transferred, as if it were a creditor. See Klein v. Cornelius, 786 F.3d 1310, 1316–17 (10th Cir. 2015) (concluding that a receiver had standing under the Utah UFTA to recover funds illegally distributed from a business through a Ponzi scheme); Janvey v. Democratic Senatorial Campaign Comm., Inc., 712 F.3d 185, 190 (5th Cir. 2013) (holding that although "a federal equity receiver has standing to assert only the claims of the entities in receivership, and not the claims of the entities' investor-creditors," the receiver had

9

1    standing to recover assets from Ponzi scheme investors under the Texas UFTA).  Chase

2    contends that this is the <u>only</u> exception to the general rule that "a receiver occupies no

3    better position than that which was occupied by the person or party for whom he acts."

4    Mot. at 9 (quoting <u>Allen v. Ramsay</u>, 179 Cal. App. 2d 843, 854 (1960)).

5         Chase argues, moreover, that the rationale for exempting fraudulent conveyance

6    claims does not apply to tort claims.  <u>See</u> Mot. at 10–11.  And Chase contends that, as in

7    the Seventh and Eleventh Circuits, California distinguishes tort claims from fraudulent

8    transfer claims.  <u>See id.</u> at 10; <u>see also</u> <u>Isaiah</u>, 960 F.3d at 1306 (distinguishing standing to

9    sue the recipients of fraudulent transfers from standing to bring "tort claims against third

10   parties to recover damages for the fraud perpetrated by [a] corporation's own insiders");

11   <u>Knauer</u>, 348 F.3d at 235 (distinguishing the exception for voiding fraudulent conveyance

12   and claims for tort damages against third parties).

13        Because the exception in the Seventh and Eleventh Circuits only applies to

14   fraudulent conveyance claims, "receivers who assert common-law tort claims must meet a

15   heightened standard to establish their standing."  <u>Wiand v. ATC Brokers Ltd.</u>, 96 F.4th

16   1303, 1310 (11th Cir. 2024).  The receiver must also allege an "innocent director or

17   stockholder" in the receivership entities.  <u>Perlman</u>, 38 F.4th at 904; <u>Wiand</u>, 96 F.4th at

18   1310 ("To establish that a receivership estate is separate and distinct from a Ponzi scheme,

19   the receiver must allege the presence of innocent decision-makers within the

20   corporation.").  Otherwise, the receiver lacks standing to bring common-law tort claims

21   against third parties on the receivership entities' behalf.  <u>Wiand</u>, 96 F.4th at 1310–11.  In

22   other words, if there are no innocent directors or stockholders in the receivership entities,

23   the wrongdoing of the corporation is imputed to the receiver.  <u>See</u> <u>Perlman v. PNC Bank,</u>

24   <u>N.A.</u>, 38 F.4th 899, 904 (11th Cir. 2022).  Under this framework, Stapleton would lack

25   standing because the complaint alleges that Acharya was the sole operator of the

26   Receivership Entities.  <u>See</u> Compl. ¶ 5.

27        But the Seventh and Eleventh Circuit's framework does not bind this Court.

28   Additionally, prior to <u>Knauer</u> drawing the line at fraudulent conveyances, Seventh Circuit

United States District Court
Northern District of California

10

United States District Court
Northern District of California

1  courts recognized that even if corporate insiders operate corporations to further a Ponzi

2  scheme, the corporations themselves are "nevertheless in the eyes of the law separate legal

3  entities with rights and duties." See Scholes v. Lehmann, 56 F.3d 750, 754 (7th Cir.

4  1995). Before the UFTA was widely enacted across circuits, the court in Scholes declined

5  to apply the in pari delicto defense against a receiver to bar fraudulent conveyance claims

6  against a third party. 56 F.3d at 754–55. Even though the sole shareholder used the

7  receivership entities to operate a Ponzi scheme, the court reasoned that the corporations

8  were "evil zombies" under the spell of a wrongdoer, and that they became free when

9  placed in the control of a receiver. Id. at 754. Because "the appointment of the receiver

10  removed the wrongdoer from the scene," the corporations were entitled to the return of

11  their money, not for the benefit of the wrongdoer, but for innocent investors harmed by the

12  wrongdoer's unauthorized diversion of funds. Id.

13      The reasoning in Scholes is persuasive. Further, the Ninth Circuit similarly did not

14  impute wrongdoing to a receiver where a defendant argued that the in pari delicto defense

15  barred the receiver's tort claims. See F.D.I.C v. O'Melveny & Myers, 61 F.3d 17, 19 (9th

16  Cir. 1995). Thus, the Court does not adopt the Seventh and Eleventh Circuit's framework,

17  which would require Stapleton to allege an innocent stockholder or director in the

18  Receivership Entities in order to have standing.

19          **3.    Whether the Ninth Circuit's <u>O'Melveny</u> principles apply**

20      Stapleton's argument for standing relies on O'Melveny. See Response at 5–6

21  (citing O'Melveny, 61 F.3d at 19). In O'Melveny, the court concluded that courts should

22  not impute the inequitable conduct of a corporation in receivership to a receiver bringing

23  claims on behalf of the corporation if the result would be inequitable. 61 F.3d at 19.

24  Accordingly, the court declined to apply the in pari delicto defense to bar a malpractice

25  claim against a law firm that was initiated by a receiver on behalf of receivership entities.

26  O'Melveny, 61 F.3d at 19. The court reasoned that imputing the wrongdoing of a

27  corporation to a receiver bringing tort claims against a third party improperly frustrates the

28  purpose of a receiver. See id. (holding that "the equities between a party asserting an

11

United States District Court
Northern District of California

1    equitable defense and a [corporation in receivership] are at such variance with the equities

2    between the party and a receiver of the [corporation] that equitable defenses good against

3    the [corporation] should not be available against the receiver.").  Stapleton contends that

4    under O'Melveny, even if Acharya's fraudulent conduct is imputed to the Receivership

5    Entities, Stapleton, as a receiver for the Receivership Entities, is not barred from bringing

6    tort claims against Chase.  Response at 5–6.  Stapleton's argument is persuasive.

7         The court in O'Melveny explained that a receiver is appointed "as part of an

8    intricate regulatory scheme designed to protect the interests of third parties who also were

9    not privy to the [corporation's] inequitable conduct."  61 F.3d at 19.  Therefore, "[t]hat

10   scheme would be frustrated by imputing the bank's inequitable conduct to the receiver."

11   Id.  In essence, the court held that barring claims brought by a receiver under theories

12   related to in pari delicto undermines the legal significance of appointing a receiver, to the

13   detriment of the corporation in receivership and innocent investors.  See id. (concluding

14   that the application of the in pari delicto defense is only justifiable against the wrongdoer

15   himself).

16        Chase argues that the principles set forth in O'Melveny are inapplicable here for

17   three main reasons.  First, Chase contends that Casey and Peregrine control the issue of

18   standing under California law.  Reply at 7.  This argument is unpersuasive because, as

19   previously mentioned, Casey and Peregrine are distinguishable from O'Melveny as cases

20   pertaining to bankruptcy trustees.  "[A] bankruptcy trustee's standing differs from a

21   receiver's."  Winkler, 83 F.4th at 725.

22        Second, Chase argues that O'Melveny is limited to malpractice claims and third

23   parties that owed the corporation a fiduciary duty.  Mot. at 12–13.  Chase relies on

24   Pasternak, in which a court in the Central District of California declined to apply

25   O'Melveny to an action that a receiver initiated against a bank for unjust enrichment.  See

26   id. at 13 (citing Pasternak v. Cal. Nat'l Bank, No. CV0409596DDPPLAX, 2005 WL

27   8155021, at *2 (C.D. Cal. Nov. 21, 2005)).  This argument is also unpersuasive.

28        In Pasternak, a receiver sued a bank for unjust enrichment for participating in a loan

fraud scheme with the receivership entities by processing and approving fraudulent loans, id. at *1, whereas in O'Melveny, a receiver sued a law firm for malpractice in connection with fraudulent real estate transactions, see O'Melveny, 512 U.S. at 81. The court in Pasternak did not only distinguish the bank from the law firm in O'Melveny because the firm owed the receivership entities a fiduciary duty. Pasternak, 2005 WL 8155021, at *2. The court also noted that, under general equitable principles, "[the bank] did not gain any windfall; it lost money." Id. ("[The bank] lost several million dollars as a result of the loans processed."). In contrast, Stapleton alleges that "the Receivership Entities conferred benefits upon Chase Bank in the form of deposits from which Defendants generated income, including but not limited to interest, transfer fees, service fees, transaction fees and online banking fees." Compl. ¶ 181. Because Chase financially benefitted from Acharya's fraudulent deposits, the equities weighs in favor of applying O'Melveny. To conclude otherwise would provide Chase with a windfall.

Third, Chase argues that Stapleton lacks standing to bring the claims alleged, and that it is not asserting the in pari delicto defense like the defendant in O'Melveny. See Reply at 3. But both Chase's standing argument and the in pari delicto defense contend that because the Receivership Entities participated in the fraud, the Receiver cannot bring tort claims against third parties. See Mot. at 3–10; see also O'Melveny, 61 F.3d at 19. O'Melveny held that "equitable defenses good against the [receivership entities] should not be available against the receiver." O'Melveny, 61 F.3d at 19. The court could not have reached this conclusion if the receiver's claims were initially barred by heightened standing requirements. Therefore, Chase's argument fails.

Moreover, this Court is not the first to hold that a receiver has standing to pursue tort claims against third parties, even where the receivership entity participated in the fraud. See, e.g., Mosier v. Stonefield Josephson, Inc., No. CV 11-2666 PSG EX, 2011 WL 5075551, at *6 (C.D. Cal. Oct. 25, 2011); see also Mosier v. Stonefield Josephson, Inc., 815 F.3d 1161, 1167 (9th Cir. 2016) (affirming the district court conclusion as to standing). In Mosier, the SEC initiated an action against a corporation for fraudulent

conduct and securities violations, including "making material misrepresentations regarding the use of investors' funds and diverting the funds for improper purposes." Mosier, 2011 WL 5075551 at *1.  The receiver for the corporation brought tort claims against an accounting and business consulting firm for professional negligence, aiding and abetting conversion, and unjust enrichment. Id. at *2.  The receiver alleged that the firm knowingly assisted the principals of the corporation in misappropriating funds by failing to conduct audits in accordance with Generally Accepted Auditing Standards and by preparing and distributing false and misleading auditing reports. Id. at *1.  The firm argued that the receiver lacked standing because the claims that the receiver asserted belonged to investors and that the in pari delicto defense applied because the corporation and its directors and officers were "completely responsible for the fraudulent scheme." Id. at *2–4.

The court held that the receiver had standing to pursue the tort claims. Id. at *4, 6. The court conceded that, in general, a receiver only has the capacity to bring actions that could have been brought by the entity in receivership. Id. at *3 (citing Scholes, 56 F.3d at 753).  Additionally, the court held that a receiver cannot pursue claims where the harm alleged was suffered only by third party investors. Id. (citing Williams v. Cal. 1st Bank, 859 F.2d 664, 666 (9th Cir. 1988)).  But, noting that the firm's conduct allowed the corporation's principals to dissipate assets, and caused corporate affiliates to be unable to pay operating expenses, the court held that the receiver had adequately alleged that the corporation suffered an injury. Id. at *3–4.  "While certain allegations . . . could conceivably be said to allege injury to investors as well, this does not necessarily vitiate the receiver's standing to pursue claims on behalf of the receivership entities." Id. at *3 (citing Smith v. Arthur Andersen LLP, 421 F.3d 989, 1002–04 (9th Cir. 2005)).  "So long as an entity in receivership has suffered harm, an equity receiver has standing to pursue a claim for such injuries—even if the creditors of the receivership entity may also have a claim arising from the same underlying misconduct." Mosier, 815 F.3d at 1166.

The court also rejected the defendants' argument that, even if the receiver had standing, the in pari delicto defense barred the claims because the corporation and its

14

1    "directors and officers were completely responsible for the fraudulent scheme." Mosier,

2    2011 WL 5075551 at *4.  It held that although O'Melveny did not mean that equitable

3    defenses may never be asserted against federal receivers, the equitable considerations that

4    guided the O'Melveny decision applied to the facts alleged.  Id. at *6 ("[T]he Receiver in

5    this case was not a party to any of the alleged misconduct in which the [corporation]

6    engaged.").  Accordingly, the court denied the motion to dismiss.  Id. at *9.

7            Mosier is factually similar to this case and well-reasoned.

8                    **4.    Conclusion as to Article III Standing**

9            In sum, the Ninth Circuit has not adopted the Second Circuit's Wagoner rule or the

10   Seventh and Eleventh Circuit's framework for evaluating a receiver's standing to sue.

11   This Court will not do so now.  Stapleton has alleged that Chase's conduct was "integral to

12   the scheme" and that had Chase not knowingly and substantially assisted the scheme, the

13   Receivership Entities would not have been driven "deeper into insolvency."  Compl. ¶¶ 59,

14   134–36.  Chase also allegedly benefited from the scheme by generating significant fees in

15   deposits.  Id. ¶ 99.  The principles of equitable balancing articulated in O'Melveny govern

16   against imputing Acharya's misconduct to Stapleton.  The Receivership Entities suffered

17   injury from increased liabilities and deepening insolvency.  See Compl. ¶¶ 36, 42, 59; see

18   also Mosier, 2011 WL 5075551 at *3; McHale, 919 F.Supp. 2d at 1052.  Therefore,

19   Stapleton has standing to pursue tort claims against Chase.

20           **B.    Prudential Standing**

21           Chase next argues that Stapleton lacks prudential standing.  Mot. at 15.  The

22   prudential limitations to standing require that the plaintiff "assert his own rights, rather

23   than rely on the rights or interests of a third party."  Sahni v. Am. Diversified Partners, 83

24   F.3d 1054, 1057 (9th Cir. 1996) (citations omitted).  Chase argues that Stapleton lacks

25   prudential standing because Stapleton's claims seek to redress harm to investors or the

26   public at large, rather than harm to the Receivership Entities.  Mot. at 15.  Stapleton

27   responds that he is asserting claims solely on behalf of the Receivership Entities and seeks

28   to recover funds that Acharya and Chase misappropriated from the Receivership Entities.

United States District Court
Northern District of California

Response at 8.  Stapleton's argument, again, prevails.

The line between claims of the debtor and claims of creditors is not always clear. The focus of the inquiry is whether a receiver is seeking to redress injuries to the debtor itself, caused by the defendants' alleged misconduct.  Smith, 421 F.3d at 1002.  Although "any injury to an insolvent firm is necessarily felt by its creditors," this does not deprive a corporation of its injury, or a receiver of his standing to sue.  Id. at 1004 (concluding that the unauthorized dissipation of assets limiting a corporation's ability to repay its debts is not an injury that solely belongs to the corporation's creditors).  "[A receiver] has standing to bring a suit on behalf of the debtor corporation against third parties who allegedly helped that corporation's management harm the corporation."  McNamara v. Nat'l Merch. Ctr., Inc., No. CV2101122MWFKSX, 2022 WL 2286490, at *5 (C.D. Cal. Feb. 24, 2022) (citations omitted).

Stapleton alleges that Chase's conduct with Acharya left the Receivership Entities with mounting liabilities, insurmountable debt, and deepening insolvency.  See Compl. ¶¶ 36, 42, 59.  Stapleton alleges that Acharya continued depositing investments into Chase bank accounts held by the Receivership Entities, even though his enterprise was not profitable.  Id. ¶ 59.  Moreover, Acharya allegedly used Receivership Entity funds to pay the debts of other Receivership Entities, rather than on real estate projects.  Id. ¶¶ 39–41. Stapleton alleges that, consequently, the Receivership Entities owed significant liabilities from abandoned and unprofitable projects.  Id. ¶ 36.

Stapleton also alleges that frequent and rapid transactions, improper transfers, and required monitoring notified Chase of Acharya's fraudulent activities.  Id. ¶¶ 39, 60–71, 110–32.  Stapleton alleges that, rather than investigate the accounts to ensure compliance with federal FFIEC guidelines and AML regulations, Chase assisted Acharya in continuing the fraudulent scheme.  Id. ¶¶ 109, 132–35.  Specifically, Stapleton alleges that Chase employees went above and beyond ordinary banking services to help Acharya circumvent holding periods for deposits and evade fraud detection procedures.  Id. ¶¶ 83–86.

These allegations sufficiently allege that the Receivership Entities suffered a harm

16

caused by Chase that is distinct and separate from the harm to Silicon Sage's creditors and investors.  See Mosier, 815 F.3d at 1167 (holding that where a receiver alleges conduct that caused a corporation "additional losses," the corporation has suffered an injury for which a receiver is authorized to seek recovery).  Accordingly, Stapleton has prudential standing for the claims he asserts.

### C.    Statute of Limitations and Tolling

Chase further argues that Stapleton's claims are barred by the applicable statute of limitations.  Mot. at 15–18.  "The statute of limitations for a cause of action for aiding and abetting a tort generally is the same as the underlying tort."  Am. Master Lease LLC v. Idanta Partners Ltd., 225 Cal. App. 4th 1451, 1478 (2014).  The statute of limitations for breach of fiduciary duty is three or four years, depending on whether the breach is fraudulent or nonfraudulent.  Id. at 1479.  The four-year statute of limitations applies unless the complaint alleges actual or constructive fraud.  City of Vista v. Robert Thomas Sec., Inc., 84 Cal. App. 4th 882, 889 (2000).  Because Acharya's breach of fiduciary duty is based on a fraudulent scheme, the three-year limitation applies.

The statute of limitations for fraud, conversion, and unjust enrichment is also three years.  See Platt Elec. Supply, Inc. v. EOFF Elec., Inc., 522 F.3d 1049, 1054 (9th Cir. 2008) ("Pursuant to California Code of Civil Procedure § 338(d), there is a three-year statute of limitations for '[a]n action for relief on the ground of fraud or mistake.'"); New Amsterdam Project Mgmt. Humanitarian Found v. Laughrin, 400 F. App'x 250, 252 (9th Cir. 2010) (holding that under California Civil Procedure § 338(c) the applicable three-year statute of limitations for a conversion claim began to run when the plaintiff learned of the conversion); Fed. Deposit Ins. Corp. v. Dintino, 167 Cal. App. 4th 333, 348 (2008) (concluding that pursuant to California Code of Civil Procedure § 338(d), the statute of limitations for a claim for unjust enrichment based on fraud or mistake is three years).  The statute of limitations for all of Stapleton's claims is therefore three years.

In California, the applicable statute of limitations may be tolled by the discovery rule and equitable tolling.  See CAMSI IV v. Hunter Tech. Corp., 230 Cal. App. 3d 1525,

1   1536 (1991); <u>HIBU Inc. v. Plotkin Fin., Inc.</u>, 722 F.App'x 625, 626 (9th Cir. 2018)
2   (citations omitted).

3       Chase argues that the statute of limitations began to run on the Receivership
4   Entities' claims against Chase when Judge Illston appointed Stapleton as a receiver on
5   February 10, 2021.  Mot. at 15.  Chase contends that because Stapleton did not file his
6   claims until more than three years later, on August 9, 2024, the claims are barred by the
7   statute of limitations.  <u>Id.</u> at 16.  Additionally, Chase argues that Stapleton provided no
8   good faith basis why the claims could not have been brought within the statutory period.
9   <u>Id.</u>  Stapleton argues that the claims are timely under California law because the discovery
10  rule, equitable tolling, and the tolling provision in the preliminary injunction all apply.
11  Response at 11–12.  Stapleton also argues that because Chase's role in the fraud scheme
12  was not immediately apparent and required extensive investigation to uncover, it is a
13  question of fact as to whether he could have acquired notice of Chase's conduct sooner.
14  <u>Id.</u>  Stapleton's argument as to equitable tolling is persuasive, and so the Court does not
15  reach his other arguments.

16      The doctrine of equitable tolling prevents the unjust technical forfeiture of causes of
17  action.  <u>Tarkington v. Cal. Unemployment Ins. Appeals. Bd.</u>, 172 Cal. App. 4th 1494, 1503
18  (2009).  "Under California law, equitable tolling has been broadly applied to avoid the
19  injustice of dismissing what would otherwise be time-barred claims, where three factors
20  are met: '(1) timely notice to the defendant in the filing of [an initial claim that serves to
21  give the defendant notice of litigation]; (2) lack of prejudice to the defendant in gathering
22  evidence to defend against the second claim [that is filed outside the statute of limitations];
23  and (3) good faith and reasonable conduct by the plaintiff in filing the second claim.'"
24  <u>HIBU Inc.</u>, 722 F.App'x at 626 (citations omitted).

25      The first requirement for equitable tolling is an initial claim filed within the
26  statutory period.  <u>Collier v. City of Pasadena</u>, 143 Cal. App. 3d 917 (1983).  The filing of
27  the first claim must alert the defendant in the second claim of the need to begin
28  investigating facts that form the basis for the second claim.  <u>Id.</u>  Generally, the defendant

*United States District Court*
*Northern District of California*

18

in the first claim is the same one being sued in the second. Id. at 924. "However, this does not mean that the defendants in the two actions must be the same." Hopkins v. Kedzierski, 255 Cal. App. 4th 736, 750 (2014). Equitable tolling may apply, even where the defendants in the two actions are not the same parties. Id. For example, equitable tolling applied where a subcontractor's suit against a general contractor put the city on notice of facts that formed the basis of a subsequent action against the city. See Structural Steel Fabricators, Inc v. City of Orange, 40 Cal. App. 4th 459, 465 (1995); see also Stalberg v. W. Title Ins. Co., 27 Cal. App. 4th 925, 933 (1994) (concluding that equitable tolling applied where plaintiff's quiet title suit against property owners put the title insurer on notice of facts that formed the basis of a subsequent action against the title insurer).

Here, Chase received timely notice to investigate the facts that form the basis of this claim. The complaint alleges that "[t]he fraudulent scheme continued until 2021, with accounts at Chase Bank at the core of the scheme." Compl. ¶ 138. The SEC filed its civil action for injunctive relief against Acharya and Silicon Sage within the statutory period on December 21, 2020; this is the first claim required for equitable tolling. See generally Silicon Sage, No. 20-CV-9247; Compl ¶ 139. Although the SEC action against Acharya and Silicon Sage did not mention Chase specifically, the suit alerted Chase to its potential culpability by referring to the bank accounts that Acharya used to consummate the fraudulent scheme. See Original Compl. ¶¶ 5, 47, Silicon Sage, No. 20-CV-9247.

Additionally, on February 10, 2021, Stapleton took control of the Receivership Entities' assets, including the Chase bank accounts. See Order Granting Appointment at 4–5, Silicon Sage, No. 20-CV-9247; see generally Order Granting Injunction, Silicon Sage, No. 20-CV-9247; see also Mot. at 18 (acknowledging that the "main accounts used by the Ponzi scheme were held at Chase" and following Stapleton's appointment Judge Illston ordered "three specific Chase accounts held by the [Receivership] Entities" to be frozen). Chase employees allegedly developed a close relationship with Acharya in the management of his accounts. See Compl. ¶¶ 74–94. Therefore, the initial SEC action and subsequent court orders appointing Stapleton as Receiver and freezing Chase accounts

United States District Court
Northern District of California

1    belonging to the Receivership Entities provided Chase sufficient notice of subsequent

2    actions relating to Acharya's fraudulent activity. See Compl. ¶¶ 142–47 ("On August 14,

3    2023, the [c]ourt in the SEC [a]ction granted the Receiver's request for permission to

4    engage undersigned counsel and bring a lawsuit against Chase Bank.").

5           The second requirement for equitable tolling requires that "the facts of the two

6    claims be identical or at least so similar that the defendant's investigation of the first claim

7    will put him in a position to fairly defend the second." Tarkington, 172 Cal. App. 4th at

8    1504 (quotations omitted). The initial SEC action alleged that "Acharya ran a fraudulent

9    scheme, made material misrepresentations to investors . . . misused investor funds, made

10   Ponzi-like payments, and duped investors to contribute new capital, roll over existing

11   investments, and defer interest payments." Compl. ¶ 139. Acharya would be unable to

12   misuse investor funds in furtherance of the fraudulent scheme without Chase bank

13   employees assisting him in circumventing required holding periods for deposits and

14   warning him about upcoming fraud detection procedures. Id. ¶¶ 77, 79, 83, 84, 86, 89.

15   Thus, the facts of the two claims are closely related and Chase is in a fair position to

16   defend against this claim.

17          The third requirement for equitable tolling requires good faith and reasonable

18   conduct on the part of the plaintiff. Tarkington., 172 Cal. App. 4th at 1505. This element

19   can turn on whether a plaintiff intentionally delayed filing the second claim or whether the

20   plaintiff took affirmative action that misled the defendant into believing that the plaintiff

21   was foregoing the claim. Id. One indicia of reasonableness and good faith is whether a

22   plaintiff filed the second claim within a reasonable time after the period of tolling

23   concluded. Collier, 143 Cal. App. 3d at 931. Chase argues that the statute of limitations

24   expired at least six months before this action was filed. Mot. at 15–16. But nothing

25   indicates that Stapleton delayed or otherwise misled Chase into believing that he would

26   forego any claim against it. Moreover, Stapleton sufficiently pleaded that the facts

27   underlying the claims required extensive investigation to uncover. Response at 12 (citing

28   Compl. ¶¶ 9, 89). Judge Illston also expressly granted Stapleton's request to engage

1  counsel to bring this suit against Chase when she oversaw the SEC action. Compl. ¶ 147.

2  Accordingly, the good faith element is satisfied.

3      Because Stapleton satisfies all three requirements, Stapleton's claims against Chase

4  are equitably tolled.

5      **D.    Unjust Enrichment**

6      Finally, Chase argues that Stapleton has not pleaded sufficient facts to state a claim

7  for unjust enrichment. Mot. at 18–19. In California, "[t]here is no cause of action . . .

8  labeled unjust enrichment. Sepanossian v. Nat'l Ready Mix Co., Inc., 97 Cal. App. 5th

9  192, 206–07 (2023) (citing City of Oakland v. Oakland Raiders, 83 Cal. App. 5th 458, 477

10 (2022)). Unjust enrichment is not available for restitution where parties have an

11 enforceable contract, unless the contract "was procured by fraud or is unenforceable or in

12 effective for some reason, or where the defendant obtained a benefit from the plaintiff by

13 fraud, duress, conversion, or similar conduct." Id. (citations omitted). Common law

14 principles provide restitution where there is "receipt of a benefit and unjust retention of the

15 benefit at the expense of another." Best Carpet Values, Inc. v. Google, LLC, 90 F.4th 962,

16 973 (9th Cir. 2024) (citing Tufeld Corp. v. Beverly Hills Gateway, L.P., 86 Cal. App. 5th

17 12, 31–32 (2022). "An individual may be required to make restitution if he is unjustly

18 enriched at the expense of another." Fed. Deposit Ins. Corp. v. Dintino, 167 Cal. App. 4th

19 333, 346 (2008) (citing Ghirado v. Antonioli, 14 Cal. 4th 39, 51 (1996)).

20      Chase argues that Stapleton has not adequately alleged unjust enrichment because

21 (1) there was an express and enforceable contract between the parties and (2) the

22 Receivership Entities received the benefit of the bargain. Mot. at 18. But Stapleton's

23 cause of action arises from Chase's alleged conduct facilitating Acharya's fraud, not from

24 a contract between the parties. See Compl.; Pro. Tax Appeal v. Kennedy-Wilson

25 Holdings, Inc., 29 Cal. App. 5th 230, 240 (2018) ("California law on unjust enrichment is

26 not narrowly and rigidly limited to quasi-contract principles."). Moreover, Stapleton seeks

27 compensation for Chase's alleged participation in Acharya's fraud, not in exchange for

28 legitimate banking services. Stapleton alleges that "the Receivership Entities conferred

United States District Court
Northern District of California

benefits upon Chase Bank in the form of deposits." Compl. ¶ 181. Had Chase complied with FFEIC guidance and followed ordinary banking procedures, it would likely not have obtained as many fees from accounts held by the Receivership Entities. Id. ¶¶ 69, 70, 77, 89, 110. Accordingly, Stapleton has adequately alleged unjust enrichment.

However, Stapleton's unjust enrichment claim still fails. Where a plaintiff brings a cause of action for unjust enrichment with a claim for aiding and abetting breach of fiduciary duty or fraud, courts will dismiss the claim for unjust enrichment so that a plaintiff can pursue it as an equitable remedy rather than a separate cause of action. See LeBrun v. CBS Television Studios, Inc., 68 Cal. App. 5th 199, 210–11 (2021) (rejecting an expansive application of the unjust enrichment doctrine that seeks to allege unjust enrichment as a separate and independent cause of action from fraud); Am. Master Lease LLC v. Idanta Partners, Ltd., 225 Cal. App. 4th 1451, 1483 (2014) ("Disgorgement based on unjust enrichment is an appropriate remedy for aiding and abetting a breach of fiduciary duty."); Sepanossian, 97 Cal. App. 5th at 207 (holding that a plaintiff's remedies for fraud rendered a separate claim for unjust enrichment unnecessary).

Here, the basis of Stapleton's unjust enrichment claim is that the fraudulent scheme conferred a benefit on Chase through transactions and deposits in furtherance of Acharya's fraud. Compl. ¶ 181. Because the unjust enrichment claim merely incorporates the allegations for aiding and abetting, and restitution is an adequate remedy for such claims, a separate claim for unjust enrichment is unnecessary. Therefore, the Court dismisses Stapleton's claim for unjust enrichment, but allows him to pursue it as a remedy in connection with his other causes of action.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** the motion as to the claim for unjust enrichment and **DENIES** the motion in all other respects.

**IT IS SO ORDERED.**

Dated: April 21 , 2025

CHARLES R. BREYER
United States District Judge

United States District Court
Northern District of California

22